## WILL OF EBENEZER W. COLE.

*March 31 — April 20, 1880.*

WILLS: *Insane Delusion: Costs.*

1. The line between insane delusion and the unfounded and unreasonable suspicions of a sane mind towards other persons, especially those closely connected with the person entertaining such suspicions, is sometimes very indistinct; but the legal presumption is in favor of sanity, and one who contests a will as made under an insane delusion has the burden of proof. And in this case, though the evidence shows that the testator cherished groundless and absurd suspicions against persons nearly connected with him, this court is not satisfied that it shows him to have been of unsound mind when he made the will.

2. Insane delusion of a testator, or partial insanity, will defeat the will only when it can fairly be inferred that the instrument was affected by it; and upon all the facts shown in this case (for which see the opinion), this court is of opinion that if the insane delusion here charged really existed, the provisions of the will were not influenced by it.

3. The contest appearing to have been made in good faith, the taxable costs are ordered to be paid out of the estate.

APPEAL from the Circuit Court for *Jefferson* County.

For the appellant there was a brief by *Hall & Skinner*, and oral argument by *Mr. Hall*.

*Harlow Pease*, for the respondent.

LYON, J. An instrument in writing, purporting to be the last will and testament of the deceased, was presented to the county court by his widow, *Martha J. Cole*, for probate. It was executed and attested in due form, and, by its terms, the alleged testator devised and bequeathed his whole estate to his said widow. Probate of the instrument was contested by the sons of the deceased, *Rinaldo W.* and *Elliott G. Cole*, who appealed to the circuit court from the order of the county court admitting the instrument to probate as the last will and testament of their deceased father. The trial in the circuit court, which was before the judge without a jury, resulted in the

affirmance by that court of the order of the county court. From the judgment of affirmance the sons have taken an appeal to this court. .

The only question litigated in the circuit court, and the only one to be determined on this appeal, is, Was the alleged testator of sound mind when he executed the instrument propounded as his last will and testament? It appears from the evidence that Ebenezer W. Cole was born about the year 1810. He was first married in 1836. His wife died about a year later, leaving, issue of such marriage, *Elliott G. Cole*, one of the appellants, now residing in California. In 1841 the deceased again married, and about a year later his wife gave birth to *Rinaldo W. Cole*, now residing in this state, who is the only living issue of such second marriage. In 1845 the deceased removed to Watertown, in this state, with his brothers, and was in business there with them for several years. In July, 1864, the deceased and his wife voluntarily separated, and in 1869 he commenced an action for a divorce under the statute making five years' voluntary separation ground therefor. The action resulted in a judgment of divorce. The case was brought to this court, and is reported in 27 Wis., 531. The deceased intermarried with the respondent in September, 1870, and died November 4, 1878. The instrument propounded as his last will and testament bears date and was executed January 1, 1872.

The foregoing statement of the leading incidents, and the dates thereof, in the history of the deceased, is necessary to a proper understanding of the testimony relating to his alleged mental unsoundness at the time he executed the instrument under consideration. That testimony will now be considered. It appears that about the year 1863 the deceased conceived the idea that his wife was unchaste, and that *Rinaldo* was not his son. He asserted this freely and persistently from that time until he procured the divorce from her, six or seven years later; also that his wife, as well as one of his brothers, in-

tended and attempted to poison him. Beyond all question these charges were utterly groundless, and nothing appears to justify even a suspicion of their truth. The wife (since deceased) was undoubtedly a lady of high moral character, and had done no act for which she should have been made the victim of so cruel a charge. Equally baseless was the absurd charge against his brother.

The testimony develops several vagaries of the deceased during the six or seven years before mentioned, but all these had their origin in his belief that his wife was unchaste, as did also his belief that his brother was hostile to him and sought his death, and that *Rinaldo* was not his son. No reasoning or expostulation could shake that belief. When told that *Rinaldo* looked and walked like him, it seemed to make no impression upon his mind; and he was angry with his brother, who, to gratify him, had watched to see if strange men visited Mrs. Cole's apartments, when his brother reported to him that nothing of the kind had occurred. The claim that the deceased was of unsound mind, if sustained at all, must be sustained on the ground alone that his belief that his wife was unchaste and his son illegitimate amounted to insane delusion. True, there was some evidence to the effect that he was in the habit of taking large quantities of morphine and chloral daily, and that his mind was seriously affected by his ceasing the use of the latter drug a few days before he executed the instrument in question. This evidence entirely fails to satisfy us that the use or abandonment of these drugs rendered him incapable of making a valid will.

It must be conceded that the belief of deceased in respect to the unchastity of his wife, persisted in as it was without evidence to support it and against all reasonable probabilities of its truth, looks very much like insane delusion. Yet it is not necessarily so. Observation teaches us that there is a very large class of people, whose sanity is undoubted, who are unduly jealous or suspicious of others, and especially of those

closely connected with them, and who, upon the most trivial, even whimsical grounds, will wrongfully impute the worst motives and conduct to those in whom they ought to confide. This insanity, which is developed in a great variety of forms, is altogether too common, and too many persons confessedly sane are to a greater or less extent afflicted with it, to justify us in saying that because the deceased was so afflicted he was insane, or the victim of insane delusion. The line between the unfounded and unreasonable suspicions of a sane mind (for doubtless there are such) and insane delusion is sometimes quite indistinct and difficult to be defined. However, the legal presumption is in favor of sanity, and on the issue of sanity or insanity the burden is upon him who asserts insanity, to prove it. Hence, in a doubtful case, unless there appears a preponderance of proof of mental unsoundness, the issue should be found the other way.

There is but little evidence that the deceased labored under the alleged delusion after he obtained his divorce. The only evidence on the subject is that of his brother, who, after having testified generally that deceased said he did not believe *Rinaldo* was his son, further testified in substance that he did not talk in that way during the last three years of his life. Really the only evidence tending to prove the continuance of the delusion beyond 1869 or 1870, is the following testimony of the same brother : "I should think the last talk of that kind was in 1875; the last I recollect." The witness gave no particulars of the conversation. If the deceased had suffered insane delusions, there is much reason for believing they had disappeared from his mind before January, 1872.

It may be conceded that, on the proofs, this is a doubtful case; that it is difficult to say whether the unfounded and unreasonable belief of the deceased that his wife was unchaste and his son illegitimate was consistent with the condition of sanity, or whether it was an insane delusion; or, if an insane delusion, whether it had ceased before January, 1872. The

question is one of fact, and it is so doubtful how it should be determined on the evidence, that this court on appeal could not properly disturb the finding of the circuit court in that behalf, had that court found specifically upon it. But the circuit court did not find specifically whether the deceased was or was not the victim of insane delusion when he exe-cuted the instrument in question. The court only found that when he executed it he had testamentary capacity.

Now, although he may have been laboring under the insane delusion that his former wife, from whom he was divorced, had been unfaithful to him, it by no means follows that he could not make a valid testamentary disposition of his prop-erty. His sanity on all matters not connected with such alleged delusion is freely conceded on all hands, and is un-doubted. Unless his delusion controlled or influenced the provisions of his will, the will should be upheld.

The law, as laid down by Sir John NICHOLL in the great leading case of *Dew v. Clark*, 1 Add., 279; *S. C.*, 3 Add., 79, is that partial insanity may defeat a will if it can be fairly in-ferred that the instrument is the direct offspring of the delusion. But if the hallucination of the testator is inopera-tive when he executes the will — if the instrument is solely the offspring of his sane faculties, untainted and unaffected by his delusion,— it is a valid will. This rule of law is sup-ported by sound reason, and cannot be abrogated without greatly endangering the testamentary right.

We will now briefly examine this case in the light of the above principle. In order to do so, we assume, of course, that the deceased, when he executed the instrument pro-pounded as his last will and testament, was under insane delusion in respect to the chastity of his former wife and the legitimacy of *Rinaldo*. The precise question to be considered is, Did such delusion influence the provisions of the instru-ment? In other words, was the instrument the offspring and

result of the delusion? The leading features of the case affecting this question are as follows:

*First.* There is no evidence that his delusion affected the conduct of the deceased towards *Rinaldo* in the slightest degree, or that he ever failed to treat him as a father should treat a son.

*Second.* The deceased made some provision for both of his sons, from time to time, and there is no evidence that he discriminated between them. The case does not show that he made any better provision for *Elliott* than he did for *Rinaldo*. If the will disinherits *Rinaldo*, it also disinherits *Elliott*.

*Third.* The proofs tend to show that the divorced wife is dead, and that the estate which she received as alimony descended to *Rinaldo*. A very liberal allowance was made to her in the divorce suit. 27 Wis., 531. Whether she died before the alleged will was executed, does not appear; but were she then living, it is fair to presume that the deceased thought *Rinaldo* would inherit her estate, and thus be provided for, indirectly, out of his own estate.

*Fourth.* The will is entirely fair and reasonable. The estate of the deceased was greatly impaired by the expenses of the divorce proceedings and the alimony which he was compelled to pay his former wife. For several years before his death he was infirm and unable to earn money, and was compelled to subsist in a great measure upon his capital. When he died, his estate does not seem to have amounted to more than from $5,000 to $7,000. His wife, the proponent, lived with him and cared for him eight years, and for much of that time he was an invalid, necessarily requiring much care and attention. It is not seriously claimed that she failed in the discharge of her duty as a wife. When she married him, she had about $2,500, some part of which she loaned to the deceased, and the whole of it had been expended when he died. She was thus left at his death without any means of support

other than what she might derive from his estate. She was then nearly sixty years of age. It was the duty of the deceased to make as ample provision as his means would allow for the support of his widow during the remainder of her life, and probably his whole estate will no more than suffice for that purpose.

*Fifth.* In January, 1877, the deceased, in the absence of his wife, executed another will, making provision for the sale of his property, the investment of the proceeds, the payment to his wife of one dollar per day during her life, and after her death the residue to go to his sons, and revoking the former will. In June following he destroyed this instrument, took the first will from its envelope, read it or had it read in the presence of himself and wife, placed it in another envelope, sealed it, wrote thereon "The last will and testament of E. W. Cole," and placed it in his desk, where it remained until after he died. It was first opened by the county judge. At that time there is no reasonable doubt that the deceased was perfectly sane. The deliberate republication (so to speak) of the will under the circumstances is a most significant fact, tending strongly to show that whatever delusion the deceased was under when he executed the will, the instrument expressed his deliberate, sane judgment and wishes, uninfluenced by any delusion.

These and other less important facts in the case, which it is unnecessary to comment upon, impel us to think that the circuit court held correctly that the deceased had testamentary capacity; that is, was of sound mind when he executed the instrument propounded as his last will and testament. At least, the evidence is so strong in that direction that we cannot disturb the finding.

The judgment of the circuit court must be affirmed; and inasmuch as we perceive no reason to doubt the good faith of the contestants, the taxable costs must be paid out of the estate.

*By the Court.*— So ordered.