ESTATE OF BEAN: COWAN, Appellant, vs. BEAN and another, Respondents.

*November 18—December 8, 1914.*

*Wills: Mental capacity: Evidence: Preponderance against findings below: Weight: Physicians: Hypothetical questions: Appointment of guardian: Effect: Statute construed: "Gifts:" Supreme court: Allowance for attorneys' fees.*

1. The clear preponderance of the evidence in this case is *held* to show, contrary to the findings of the county and circuit courts, that a testatrix had testamentary capacity at the time of making her will.

2. The opinions of physicians as to the mental competency of a testatrix are of little probative force where they are based upon the facts assumed in a hypothetical question from which all the matters and evidence relied upon by the proponent were excluded.

3. Where the appointment of a guardian for an aged person was

sought because of physical and not mental disabilities, and the evidence taken in that proceeding shows that no guardian should have been appointed, the appointment is of no evidentiary force or weight upon the question of the testamentary capacity of such person.

4. Sec. 3979, Stats.,—providing that the petition and order for notice in guardianship proceedings may be filed and recorded, and if a guardian is appointed all contracts except for necessaries and all *gifts*, sales, and transfers of property by the incompetent after such filing shall be void,—does not apply to wills or legacies provided for in wills.

5. Under sec. 4041b, Stats., the supreme court may, in a contest as to the probate of a will, fix the amount to be allowed as attorneys' fees for work done in that court.

APPEAL from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Reversed.*

This action involves a will contest. The testatrix, Ann Bean, made her will on July 13, 1910, and died in July, 1912. On July 8, 1910, a petition was filed in the county court of Winnebago county for the appointment of a guardian for Ann Bean, which alleged among other things that she was mentally incompetent because of total blindness which had existed for more than twenty-five years, because of her advanced age and of a recent accident which she had suffered, and because of physical disability and a weak mind. A hearing was had on such petition and on August 13, 1910, one Edwards was appointed guardian for the alleged incompetent. The deceased by her will gave all of her property to two nephews and one niece. Her surviving heirs at law were a brother, who was blind, two sisters, twenty-nine nieces and nephews, two grandnephews, and one grandniece. The appraised value of her property was $4,283.70. The deceased had lived for many years in a house occupied by her sister and her sister's son and his wife and their children. Objection was made to the allowance of the will to probate on the ground that the testatrix was mentally incompetent to make a will and on the further ground that the will was the result of undue influence. The contest was heard in the

county court and that court held that there was no evidence of undue influence, but further held that the testatrix did not have testamentary capacity when the will was made. From the order and judgment of the county court refusing to admit the will to probate an appeal was taken to the circuit court. In that court the case was tried in part on the original record and on some additional testimony which was offered. The circuit court found as a fact that when the will was executed and for some time prior thereto the testatrix had and was suffering from senile dementia and that by reason of such disease she was wholly incapacitated to make a will, and that the paper purporting to be her will was not a sane and intelligent expression of her testamentary purposes for the disposition of her property, and that she was lacking in mental capacity to make a valid will and wholly incompetent to do so. The court further found that no undue influence was exercised over the testatrix. The order and judgment of the county court were affirmed, and from the judgment of affirmance an appeal was taken to this court.

For the appellant there was a brief by *Carter & Pedrick,* and oral argument by *S. M. Pedrick* and *W. N. Powers.*

For the respondents there was a brief by *John W. Hume* and *Silas Bullard,* and oral argument by *Mr. Hume.*

BARNES, J. This case involves a question of fact pure and simple. It has been carefully tried by a capable county judge of recognized ability who has long been an honored member of the bar of this court. It has been tried a second time by an able and experienced circuit judge, who has reached the same conclusion as did the county judge. We approach the matter of overturning the findings of fact made by these two courts, with some misgivings. The findings may not be disturbed unless they are against the clear preponderance of the evidence, and there is certainly some evidence to support them. The case is here, and it is the duty of this court to reach what it deems to be a correct conclusion,

always bearing in mind the effect that should and must be given to findings of fact made by judges who have heard the testimony and had the opportunity to see the witnesses who gave it. The will was short and easily understood and made a rational disposition of the property of the testatrix.

A brief synopsis of the evidence offered in behalf of the proponent will first be given. It is of two kinds: that dealing with Ann Bean's condition on the day the will was made and that relating to her prior condition. She had been blind for about twenty-five years before she made her will. She occupied a couple of rooms in the house of her sister Mrs. Pugh, where she did her own cooking and cared for herself as well as she could. Five or six weeks before the will was made, while she was lighting a fire, her clothing caught fire and she was seriously burned and suffered a great deal of pain from the injury. She was attended by Dr. Schallern of Ripon, who had been her physician for some time. On July 12th she asked Charles Jones, a neighbor, to write a letter for her to Dr. Schallern requesting him to bring over *Charles Cowan,* a banker at Ripon, to draw her will. The letter was written, and the following day Dr. Schallern came to Ann Bean's home. The doctor was accompanied by his son, *Mr. Cowan,* and Dr. Hall, another Berlin physician. Dr. Hall seems to have been taken along for the purpose of ascertaining the mental condition of Miss Bean. The two doctors in substance testified that she told them she wanted to make her will and of the disposition she wanted to make of her property. They say they talked with her about half an hour to ascertain her mental condition and that they arrived at the conclusion that it was good and that she was perfectly competent to make her will. *Mr. Cowan,* and Charles Jones who was called in to witness the will, corroborated the testimony of the physicians and expressed the opinion that she was entirely competent to dispose of her property. Dr. Schallern's son, who was present and was one of the wit-

nesses to the will, testified that in his opinion her mental condition was perfect at the time the will was made. As far as the record discloses, all five of these witnesses were entirely disinterested. Rose Fuller, a sister of the wife of. Miss Bean's nephew, David Pugh, had been living in the same house with Miss Bean since the 1st of July and talked with her from time to time, including the day the will was made. The witness said Miss Bean's mind seemed to be perfectly natural and she thought it was very sound. She testified that Miss Bean told her after the will was made that she was glad that "it was done and it was done as it should be." Hugh Williams, a near neighbor, who had known Miss Bean for thirty-five years, testified that he had seen and talked with her quite frequently up to the time of the execution of the will and that in his opinion her mental condition was all right on the occasion of his visits. He talked with her on the evening of the day the will was made and she told him about it and that she was glad that it was over with. In the opinion of the witness she was mentally competent to transact business on the day the will was made.

The foregoing is all of the testimony specifically directed to the mental competency of Miss Bean on July 13, 1910.

In addition to the evidence of the witnesses Jones, Fuller, and Williams, who testified to the mental condition of Miss Bean before and after the execution of the will, a number of other neighbors, acquaintances, and relatives expressed the opinion that she was of sound mind, basing their judgment on conversations occurring near the time the will was made.

Mrs. Plantz knew Miss Bean thirty-five or forty years. They lived about a half a mile apart. She said she used to visit Miss Bean and could talk with her as well as with any person. Remembered when she was burned; saw her after that several times and talked with her; she suffered a good deal from the burns. Her memory was all right as far as the witness could see. If she asked her any questions she

answered them all right.   Saw her frequently until she died. She was a little odd because she was blind, and acted kind of funny, but otherwise she was all right so far as the witness could see.   Jennie Miller, the daughter of Mrs. Plantz, testified that she visited Miss Bean two or three times a year and as far as she could see her mind was perfect.   Saw her twice after she was burned, once three or four days after and then three or four weeks later.   The first time her physical condition was not all right, but she thought her mental condition was.   The second time, she talked with her and thought her mental condition was all right; saw no change from what she had been during the years before.   William Park, a neighbor, testified that he saw and talked with Miss Bean frequently before and after she was burned and that she appeared to be all right at all times.   This witness testified that she told him that Attorney Weisbrod was sent out there by her sister Mrs. Davis to make a will, and that she didn't like him and would not do anything for him.   Mrs. Thrall lived about a mile and a half from Miss Bean and knew her for forty-five years and visited her quite frequently.   She called on Miss Bean about a week after she was burned and had a talk with her; talked about the weather and such things as that.   Miss Bean was glad to see her and wanted her to come again.   She came back in a month and Miss Bean asked her many questions about business and the neighbors.   She was very much better.   She spoke about folks being good to her while she was sick.   Her talk was not incoherent or disconnected.   Saw her afterwards in September.   She recognized witness' voice immediately, talked about the farm, asked after witness' husband and wanted to know how he was, and said she would be glad to have him come and see her.   Witness thought that at all times her mind was sound.   William Pugh, a nephew of Miss Bean and a brother of the beneficiaries in her will, said he saw her about the 1st of July, 1910, and that she then told him how she was burned; next saw her the first part of August.   "She

asked if there were any sales of shoes going on in town, and I said 'Yes.'" "She asked me if I would get her a pair if she gave me the money, and I said I would. She also asked me to get some home-made wine if I could get it. She gave me two dollars to buy shoes and a dollar for the wine. I could not get the size shoes she wanted, but sent the wine to her." Later in August he called on her, and she told him that he owed her $2. He did not have the change at this time and did not see her again until December, when he offered the $2 to her and she told him to keep it, that she would make him a present of it. She spoke to witness once about her will and said that Weisbrod had been out there, but she would not have him make her will, but she said she had made one. This witness resided in Oshkosh. Richard Pugh, who was intimately acquainted with Miss Bean, said that he never saw anything wrong with her before she was burned and that she transacted her own business and used good judgment. Never had any idea but what she was all right up to the time the will was made.

Aside from the medical testimony offered, the contestants swore eleven witnesses who knew Miss Bean in her lifetime and who expressed an opinion as to her mental competency and detailed the reasons for their belief. Most of them were interested in having the will set aside.

L. Williams's testimony tended to show that Miss Bean was sane both before and after she was burned. He simply said that her memory was not so good in 1910 and 1911 as it had been. Mrs. Ethel Bean's testimony hardly tends to show insanity before the will was made. She testifies to facts occurring thereafter, however, which would indicate that Miss Bean was not in her right mind. Ellen Bean said that she had heard Ann say that she would remember *Alvin Bean* in her will. Saw her shortly after she was burned; she didn't know anything; she couldn't understand anything I said to her; she didn't say much of anything; she was very low that

day; her fingers and hand were burned almost to the bone and she suffered greatly and was more or less delirious; the year before she was at my house over a week and had a pretty bright mind at that time.

August Semrau talked with Miss Bean at some indefinite time after she was burned; thought she was a little out of the way because she repeated statements she had made and asked the same questions more than once. Thought from the way she talked that she wasn't competent to do business. Mrs. Ed Williams thought she saw Miss Bean in 1907, 1908, 1909, and 1910, but didn't remember much about it. Saw her on July 30, 1910. Ann did not recognize her. "I told her who I was, and after I told her over and over she was able to recognize me." She asked two or three times how witness came. "When I saw her in July, 1910, I didn't think she was sound. I shouldn't say she was able to make a will at that time." Saw her again in April, 1911. "I had to tell her more than once who I was before she recognized me. We didn't talk very much because I didn't think she was able to talk a great deal."

Mrs. R. C. Lloyd saw Miss Bean during the spring of 1907, 1908, and 1909 occasionally, now and then, not very often. "She was getting kind of forgetful. Her memory didn't seem to be the same as it used to be. I couldn't tell when I first noticed a change. Well, her mind wasn't the same before she was burned; that is, she used to talk the same thing over and promised this and promised that and never fulfilled her promises." "She was burned on June 4, 1910. I was there sitting up with her Wednesday night." "Well, she talked a good deal and I never paid any attention to what she said. She said 'The roof is coming down on me.'" "About a week after this I was there and she didn't recognize me and I couldn't make her understand who I was. I should say from what I saw of her on those visits that she was not sound . . . or would have been able to carry in her mind the extent of her property and the persons who were the natural objects of her bounty."

Hannah Bean saw Ann Bean frequently in 1906, 1907, 1908, and 1909. "She was sometimes very good and after that very changeable." Witness did not notice any change in her mental condition the first time she saw her. Saw her changing in 1911. "Before she was burned I went up to her and shook hands with her and she didn't know me." "She talked to me. I forgot what she said. She had no right talk." "Her mind kept to me just the same, changeable all the time." "I was there in 1911." "That night I was with her by the bed and she said, 'He's a dog to me, take that dog out, he will bite me.' I couldn't see any dog." "Every time I went there she told me to lock the door, she didn't want anybody in." "Her mind was different from other persons'. I couldn't call it sound. I guess for my part I would call it unsound." "She told me one day that there was a board where she sat on the wheel chair, I should find the board, and she made me hunt around all day for the board and I couldn't find any board." Witness had conversation with Miss Bean prior to July 13, 1910, and she said she would leave *Alvin Bean* $1,700. If we correctly understand the record, *Alvin Bean* was the son of the witness.

It will be noted that this testimony relates very largely to the condition of Miss Bean at a time subsequent to the making of the will.

William Bean testified that he knew Ann all his life. She died in June, 1912, when witness was thirty-seven years old. Visited her two or three times a year. She used to be quite jolly. "Afterwards I noted a change, about five years ago. I would get one word maybe, that would be all, then she was gone." "She seemed worried. I noticed the change during the five years." "Seemed to be coming on gradually." "I didn't see her after she was burned." Saw her three times during the month before she was buried. On one occasion she did not know witness; on another occasion she did seem to know him. The last time she didn't realize anything.

Ben Edwards: Was appointed guardian for Ann. After

that he went to see her about the middle of August, 1910.
Saw her a couple of months later. On the first day witness
saw her he thought about her physical condition more than
her mental state. "The first time that I discovered to my
satisfaction that her mind was unsound was after her sister's
death," which occurred in December, 1910. "I saw her sev-
eral times before that." Witness saw Ann, but not very
much, while he was taking the inventory. She did not really
discuss her property with him. On September 16th the ap-
praisers were there. At this time witness talked with Ann
Bean about her property and discussed each of the obligations
with her. "She was exceedingly bright that day. She seemed
to have her mind good that day. She didn't know how much
interest had been paid, but she was satisfied. We consulted
with her and she said 'Yes,' that is all that she would say."
"Q. But she had at that time an appreciation of what her
property was and how much it was? A. Well, she seemed to
be real rational that day."

The foregoing evidence was given in the county court. In
the circuit court the witness testified that a few days after he
qualified as guardian he went to see Miss Bean and that she
was waving her hands and raising her feet as if she were
climbing a ladder. Witness learned of Ann's property mostly
from her sister Mrs. Pugh. Before he had been appointed
guardian he hadn't seen Ann for twenty years.

Etta Bean testified that Dr. Schallern told her that Ann
was not capable of taking care of her property and that a
guardian should be appointed. This was on July 6, 1910.
The day after she was burned she was very weak. Her mind
wasn't as strong as it had been. She seemed to know witness,
but was not able to converse. Saw her on the 7th of July.
She didn't seem to be rational. Would ask kind of queer
questions about things that hadn't happened. Said she had
been by witness' place, and she had not, and asked about a
new house in a certain place where there was no new house

built.  Asked about an old lady who had died several years before and who she knew was dead.  This witness detailed various visits made to Miss Bean up to the time of the application for the appointment of a guardian on July 8th, and testified to actions and talk of Miss Bean which indicated that she was not of sound mind.  On the 9th the witness served · notice of the application for a guardian on Ann and found her in a nervous, excitable, and very poor condition to understand.  She did make her understand, however, what it was. It took a few minutes.  Saw her again on July 16th, when she appeared quite stupid, and again on July 25th, when she seemed to get wild and screamed and said " 'I am afraid of you,' and tried to climb the wall."  Did not go there after that.

E. W. Weisbrod, an attorney residing in the city of Oshkosh, knew Ann since 1905.  In August, 1909, at the request of Mrs. Davis, who was a sister of Ann and Mr. Pugh, witness went to place where Ann was staying to draw her will. Spent considerable time with her trying to ascertain whether she knew anything about the extent of her property or knew enough to make a testamentary disposition of it.  Was unable to get anything out of Ann that would enable him to draw her will, and he states that at that time she was mentally incompetent to make a will.  He went to her home on July 9, 1910, at the request of Mrs. Davis, for the purpose of drawing her will.  At this time she was lying on the cot all bandaged up and did not recognize him.  Couldn't make her realize who he was.  Tried to talk with her about her business.  "She never understood a word I was talking about." "She didn't seem to comprehend what I came for."  Tried to talk of her property and of her relatives and who she wished to leave her property to.  Didn't get any expression from her along that line whatever.  Remained possibly an hour with her and tried to get a statement from her from which to draw her will.  Didn't draw her will because he couldn't get the

information. "The woman was physically incapable. She didn't have the capacity to understand. She was very childish to me. She talked childish, it was on that crying and whining order, kind of melancholy I would call it." "I gave it up as useless." She was much worse than she had been in the previous August.

Two physicians, Doctors Russell and Brown, testified, in answer to a hypothetical question, that Miss Bean was demented and that they did not consider that she was mentally competent to transact business or make a will on July 13, 1910. The nature of her ailment was said to be senile dementia. The characteristics of the disease were said to be loss of memory, especially of recent events, inability to recall things that recently occurred, liability to make appointments and forget them, and to dispute correct bills or want to pay them a second time, inability to carry on an extended conversation, incoherence, failure of will power, stubbornness at the beginning of the disease, extreme feebleness and childishness toward the end, inability to call familiar objects by their right names, extreme penuriousness, hallucinations, and crying fits. Often those affected become immoral. Dr. Russell said sometimes the disease developed slowly, so that it would be a series of years before it became apparent to onlookers. In other cases it develops quite rapidly. Usually it would develop in a year or two. After one begins to have hallucinations he or she would be incompetent to make a will, although such a person might be pretty bright on some subjects at times. Dr. Brown testified:

"My answer to the hypothetical question included all the conditions in the question and as of the last time mentioned in that question. That was through and including some time in 1911. I don't think a person would have mental capacity sufficient to hold together in their mind what their property was or the natural objects of their bounty, in this individual case. I couldn't state for how long a period before that."

These two physicians were no doubt both capable and honest, and no just criticism can be made of the testimony given by them. Their opinion was based on an assumed state of facts. Every particle of evidence on which the proponent relies was excluded from the question, and some of the facts stated therein have no satisfactory evidentiary basis. Taking all of Dr. Brown's evidence, it is doubtful as to whether he thought she was incompetent when the will was made. Dr. Russell's evidence indicated that the disease was slow in developing, and that it might be difficult to determine when the border line between sanity and insanity had been passed, but he thought that after the hallucinations began the mind was insane at all times.

If we correctly understand the evidence of the physicians, old-age insanity seldom comes on suddenly. There is a gradual weakening or breaking down of the mental faculties, which is ordinarily slow and invariably progressive. The mind gradually loses its alertness and power of concentration until it is no longer capable of forming an intelligent judgment. When that period arrives, it is probable that there are no lucid intervals, although the person afflicted may be brighter at some periods than at others. 1 Wharton & S. Med. Jurisp. sec. 699; 2 Tuke, Dict. of Psychological Med. p. 872; 3 Witthaus & B. Med. Jurisp. etc. 221, 257, 263.

The question here is: What was Ann Bean's mental condition on July 13, 1910? The county court thought that she was suffering from senile dementia when she died and that the disease had progressed so far when the will was made that she was not able to appreciate the kind and amount of property which she had nor to intelligently select the objects of her bounty.

The circuit judge in his opinion stated that under certain decisions which he cited he would be inclined to hold the testatrix competent were it not for the guardianship proceed-

ings, the force that he thought should be given to sec. 3979, Stats., and the decision of the county court.

The evidence tending to show mental incompetency when the will was made is weak. The deliriousness and incoherence testified to after Miss Bean was seriously burned are well accounted for by the fact that she was suffering intense pain from her burns. If for the moment we pass the testimony of Mr. Weisbrod and Mrs. Etta Bean, little was shown except forgetfulness on the part of the testatrix, who was about seventy years old when the will was made. There are a whole lot of people who are forgetful long before they reach this age and who have an annoying habit of asking the same question more than once, but who are not insane. True, she did not recognize some people who called on her. But she had been totally blind for twenty-five years. The testimony of Etta Bean relates to the condition of Ann after she was burned, and she admits that Ann's mental condition seemed to improve after her burns began to heal up.

The strongest item of evidence produced by the contestants was that given by Mr. Weisbrod. When he visited Miss Bean in 1909 she was either insane or was shamming insanity, according to his evidence. There are some indications that she was shamming. At this time she was away from home visiting relatives and had expressed no desire to make a will, nor, as far as we can learn from the record, sent for Mr. Weisbrod for this or any other purpose. He seems to have been sent at the instance of her sister Mrs. Davis. Whoever sent him must have thought that she was competent to make a will. She was blind and feeble and away from home among relatives who were apparently anxious that she should make a will that would redound to their benefit and one which in all probability she did not want to make. If she was insane in August, 1909, with an incurable form of insanity which admitted of no intervals of lucidity, it is strange that no one else found her in any such condition until she was burned

early in the following June. Mr. Weisbrod came to see her again, at the instance of Mrs. Davis, four days before she made her will. He could not get her to talk and thought she was worse than when he saw her the preceding August. This evidence is significant, although it might be said that Ann did not want Weisbrod to draw her will and did not send for him.

Giving due weight to the evidence of Mr. Weisbrod and to that of the other witnesses who were produced by the contestants, we think the clear preponderance of the evidence is to the effect that Miss Bean had testamentary capacity on July 13, 1910. Her family physician should know more about her condition than any one else, and there is nothing to show that he had any interest or bias in the matter. The experience and training of physicians is such that they ought to be able to form reasonably correct conclusions on the condition of a person's mind. It is on the result of their judgment and experience that alleged insane persons are committed to our state institutions. If all of the testimony had been before Doctors Russell and Brown and they then expressed the opinion that she was insane when she made what purported to be her will, their opinions would have much countervailing weight. As it is, while their evidence was competent and proper, its probative force was very small. Nineteen out of every twenty persons would probably express the opinion that Miss Bean was insane, if they had before them only the matters stated in the hypothetical question and assumed them to be true. It seems to us the figures would be pretty nearly reversed if these same persons were asked for an opinion based on the entire evidence. The evidence of Doctors Schallern and Hall was strongly corroborated by a number of witnesses who had frequent opportunities to observe Miss Bean's condition and who were disinterested. The case on its facts is to our minds weaker than that made by the contestants in the *Blakely Will Case,* 48 Wis. 294, 4 N. W.

337, where the decision of the circuit court was reversed and the testatrix was held competent to make a will.   The *Cole Will Case,* 49 Wis. 179, 5 N. W. 346, presented a still stronger showing of mental incompetency, although it is proper to state that in this case, as well as in the *Silverthorn Will Case,* 68 Wis. 372, 32 N. W. 287, the wills were sustained in the circuit court.

As we read the decision of the circuit judge, he would have sustained the will were it not for the guardianship proceedings and the provisions of sec. 3979, Stats.

The first consideration would ordinarily be quite persuasive.   It has no force here that we can see, because the evidence taken before the county judge in the guardianship proceedings is before us, and shows that the appointment was sought because of physical and not mental disabilities and that no guardian should have been appointed on the showing made.

Sec. 3979 provides that after the order for notice has been issued, the petitioner may cause a copy of the petition, with a copy of the order for notice, to be filed and recorded in the office of the register of deeds, and if a guardian shall be appointed upon the application, all contracts except for necessaries at reasonable prices, and all gifts, sales, and transfers of property by the incompetent after such filing, shall be void.

The trial court was of the opinion that a legacy is a gift. and that if the statute had been followed Miss Bean would absolutely have been precluded from making a valid will, and that the policy of the statute is to prevent the making of valid wills during the pendency of guardianship proceedings, provided a guardian is appointed under them.

We do not construe the statute as applying to wills or legacies provided for by the will.   Its object and purpose seems to be to prevent an incompetent from disposing of his property so as to place it out of his control and beyond his recall during the pendency of the guardianship proceedings.

The amendment of what is now sec. 4041*b,* Stats., by

ch. 231 of the Laws of 1909, by dropping out the word "arising," was evidently made to avoid the decision of this court in *Gertsen's Will,* 127 Wis. 602, 106 N. W. 1096. It is at least proper for this court under the statute as it now stands to fix the amount of attorney fees that shall be allowed for work done in this court. The executor is directed to pay his attorneys the sum of $100 for such services besides actual disbursements for prosecuting the appeal. No costs are awarded the contestants.

*By the Court.*—The judgment appealed from is reversed, and the cause is remanded with directions to admit the will to probate.