WILL OF McGOVERN: McGOVERN, Appellant, vs. TOFSON, Executor, and others, Respondents.

*April 9—June 26, 1942.*

For the appellant, Mary McGovern (daughter), there were briefs by *Dougherty & Dougherty* of Wisconsin Dells, attorneys, and *Bogue, Sanderson & Kammholz* of Portage of counsel, and oral argument by *David Bogue* and *Robert Dougherty*.

*Phillip Owens* of Portage, guardian *ad litem* for the respondent, Mary McGovern (niece).

*Edward J. Brown* of Wisconsin Dells and *Richard R. Rynders* of Madison, for other respondents, with *Larrabee & Larrabee* of Chippewa Falls of counsel on the brief on motion for rehearing.

The following opinion was filed May 5, 1942:

FAIRCHILD, J. The issue raised is whether testator was suffering from and acted under insane delusions that invalidated the will.

John McGovern, the testator, died March 13, 1941, having executed a will January 7, 1939, whereby he devised and bequeathed all his property to his nieces and nephews.

Testator was a graduate of Northwestern Medical School and was admitted to the practice of medicine in this state in 1906, starting his practice at Potosi, Wisconsin. November 26, 1913, he married Hannah Franke, who had been born

and reared in that village, a nurse associated with testator about four years before the marriage. Both were members of the Catholic church.

Prior to his marriage, John suffered from a sexual neurasthenia. He had been advised by specialists that his condition would be overcome by marriage. This matter was discussed by him with his prospective wife. A few weeks after marriage this difficulty seemed to have been overcome. At the time of the marriage testator was about forty-two years of age and Hannah was twenty-nine.

In a short time testator began to accuse his wife of being oversexed and of being intimate sexually with three or four men in the village. To allay his suspicions she accompanied him on his rounds of visit to patients. Hannah's father and a brother, a Catholic priest at La Crosse, separately called upon testator to attempt to convince him that his accusations were false. His wife had never given testator any grounds for such accusations. Her reputation in the village for chastity was beyond question. At the times of making these accusations testator became excited and acted in a manner described as a spell; he would pace the floor, swear at his wife, his eyes would bulge, and his face turn red. He tried to make his wife admit his accusations were true. After one of these spells testator would leave his home and stay at his office for a few days.

A daughter Mary was born on August 9, 1915. The doctor summoned for the delivery did not reach the home in time and testator himself delivered the infant. He signed the birth certificate stating that John McGovern was the father and Hannah Franke McGovern the mother of the child. The morning after the birth of the child testator refused to recognize her as his own. He declared that she resembled one of the men in the village, that she had red hair and that no member of the McGovern family had red hair. After

three days, testator dismissed the attending nurse saying that he was not going to pay for the care of an illegitimate child. At the time of these denials of paternity, testator manifested the same symptoms he had exhibited when accusing his wife of infidelity. Because friends calling upon the family spoke of the similarity between John McGovern and his daughter, he accused his wife of having suggested to their friends that they make such remarks.

Following the birth of Mary, the spells increased. Testator would look through the house nights to see if anyone were hiding there or if the pillow were disturbed; he imagined that he heard someone walking over a bridge in front of the house and would rush out to look around the house.

One time a young man in the village who drove testator's automobile for him was ordered from the office by testator without any explanation. A mutual friend later told the young man that he had been driven out because testator believed him to be the father of the child.

At the request of Hannah, the parish priest called upon John and tried to reason with him. He then told the priest that doctors had said he was impotent and could not have a child, and he spoke of his wife's improper relations, declaring that he would never change his mind.

In the year following the birth of Mary, testator's wife had a miscarriage and tried to convince him that he had improved sexually, but he refused to change his attitude. When Mary reached the age of ten months, Hannah could no longer endure living with her husband, and she separated from him taking the baby with her. As stated by Hannah: "I was almost crazy. I was just at the end of my rope. It was just three years of hell I had with him." At the time of this separation, in the summer of 1916, Hannah was given $3,000 by testator. Hannah and her daughter went to Chicago where they lived about two months, Hannah then moving to Saint

Paul, Minnesota, where she became an office nurse and where she and Mary lived almost continuously since that time.

Testator also left the village of Potosi after the separation from his wife and established himself in practice at Wisconsin Dells.

In 1916 Hannah wrote testator from Chicago requesting that he send her the baby buggy, and this was sent her. Some years later, in 1919 or 1920, Hannah again wrote to testator telling him that she and Mary were in Saint Paul getting along well and that he might see Mary any time he wished. No reply was received to this letter. In 1927, however, testator wrote to Hannah asking to see the child who was then about twelve years old. In this letter testator wrote:

"I am getting pretty old and have aged materially the last few years, and it is my wish to correct any errors made heretofore.

"I do not want to deny her what she is entitled to in a material way.

"So if you can see your way to grant this interview I can meet you anywhere at any time.

"I think you will concede that it probably would be more or less embarrassing to have this occur in any one's home. The lobby of some hotel would answer very well."

A meeting was arranged. Testator, his wife and daughter had dinner together, then talking over only general subjects. The following day, testator visited Hannah at her office and here he again fell into one of his old spells. He accused his wife of infidelity and denied his paternity of Mary, giving as a reason that she had red hair and that there was no red hair in his family. The controlling evidence shows that he and Hannah agreed that a blood test be taken of Mary and that such a test was later sent him by Hannah but that she never heard from him again.

Mary had no memory of her father save for the visit in 1927. She had been told by her mother of the separation for

the reason "that he was insanely jealous; he had a feeling as to her infidelity; and he thought I wasn't his child, and it was such a strain on her she had to leave." The child made no attempt to communicate with or call upon her father until 1935 when she was in the neighborhood of Lancaster. She wrote to her father and arranged a meeting. The father and daughter had luncheon and visited together for a short time. Whatever hopes may have existed in the heart of either father or child as to the outcome of this meeting, no feeling of love or affection was aroused and they parted. Neither saw the other again although the daughter had several times visited with her mother's family in Wisconsin.

Neither at the time of his last illness nor at the time of his funeral did the wife or daughter return or send any message. But Hannah had a Mass read for him.

In 1925 John obtained a divorce from Hannah, and this is the second instance of reference by testator to Mary as his child. Service was secured by publication. Of this divorce Hannah had no knowledge until after his death.

To the outside world testator gave little information of his relations to his wife and child, and his accusations of his wife and his denial of paternity were generally unknown in the village of Potosi where he had lived as a married man. So in Wisconsin Dells he generally kept his own counsel and his more intimate friends denied that he had ever spoken of his wife and child or of his attitude toward them. But in taverns where at times he indulged in drinking he again and again spoke of his wife's faithlessness, of Mary having red hair, and that she was not his daughter.

The afternoon before drawing his will, testator inquired of his attorney whether "he could disinherit a child;" and was told that he could. That same evening in talking with a friend he again stated that Mary was red haired and was not his daughter. The next morning he signed the will in which no mention was made of his wife or daughter, all his

property being given to nieces and nephews with whom he had maintained friendly relations.

The county court admitted the will to probate holding, (1) that regardless of any obsession that might have controlled testator in denying the paternity of his child, he was not controlled by such obsession at the time he drafted and executed the will as evidenced by the question put to the lawyer as to whether he could disinherit a child; (2) that his delusions on the subject of the paternity of his child Mary were not insane delusions, and that there was evidence tending to show "that testator believed himself at one time a victim of a venereal disease and incapable of having children;" (3) that the delusions of testator, even if insane, did not affect the nature of the will he had drawn but that under the circumstances, the coldness that existed between himself and his family and the long years that had elapsed during which he had seen neither wife nor child, even had he acknowledged Mary as his child "he would have left her nothing, because their mutual relations and feelings negatived any such thought or consideration."

The essential facts as to the relations of testator with his wife and daughter, his accusations of the former, and his denial of paternity of the latter, his reticence with his friends, and his expressions of feeling while under the influence of intoxicants, are not seriously in dispute. The serious issue is pointed out in the opinion of experts and this forms the basis for the conclusions to be drawn from the entire evidence.

The expert summoned by contestant testified that in his opinion testator "was suffering from a mixed psychoneurosis," and was subject to an obsession or "an uncontrollable urge to follow a thought or do an unnecessary action." Such obsession was continuously present and was therefore characterized as systematized, that is always the same. This expert testified that at times testator might predominate over the obsession to the extent that he did nothing "irregular;"

but that nevertheless, even at the times of such control "he still has the feeling." The obsession, however, might come to the surface only at times and therefore appear to outsiders as periodic. The obsessions in the case of the testator were the thought that he could not have sexual relations and the thought that Mary was not his daughter. The expert called on behalf of proponents gave as his opinion that testator "was mentally normal," and that on January 7, 1939, the date of the execution of the will, he did not have an obsession nor a delusion. The expert admitted, however, that if it were not shown that testator had had gonorrhea at the age of twenty-three, as some testimony suggested, then his attitude toward his wife and child would indicate an abnormal mind.

In determining whether the testator was under the control of insane delusions or obsessions no confusion need arise from the opinion of experts regarding the exact nature of the mental disorder; it is not the function of the court as a trier of fact to diagnose the exact nature of the mental disease or incapacity but to determine whether such incapacity did in fact exist and if so whether it was such as to prevent testator from drawing the will. "Further, the scientist is troubled in classifying types of mental unsoundness by the fact that many individuals present symptoms of two or more types of unsoundness at the same time. This difficulty is less annoying in the law of wills than it is in a scientific treatise, as in the former the existence or nonexistence of testamentary capacity is the only point to be determined." 1 Page, Wills (3d ed. 1941), p. 282, § 135. The medical distinction drawn in the case, therefore, between "obsession" and "delusion" need not here disturb us. The primary question is whether or not the mind of testator was "unsound" or whether, in this case, the obsession of testator amounted to an insane delusion. What constitutes an insane delusion within the meaning of the law relative to testamentary capacity is difficult to define and no less difficult to determine. 1 Page, Wills, p. 289 *et seq.,*

§§ 140–146. "The line between the unfounded and unreasonable suspicions of a sane mind (for doubtless there are such) and insane delusion is sometimes quite indistinct and difficult to be defined." *Will of Cole* (1880), 49 Wis. 179, 182, 5 N. W. 346.

The expert opinion given in this case is apparently contradictory in its conclusions, but upon final analysis it appears that the answer of the expert testifying upon behalf of the proponents rested upon the additional assumed facts that testator had gonorrhea, knew the sequela and complications of gonorrhea, and "felt one of the complications in his case was sterility and he probably felt he could not be the father of the child." The same expert further testified that in order to be effective there must be "complication or sequela of gonorrhea," and that unless there is evidence of such complication or sequela then gonorrhea is not an important factor. Assuming that the testimony of testator's brother is entitled to be considered, the evidence of the existence of this disease is decidedly lacking in convincing quality and is counterbalanced by the testimony of Finegan who stated that testator had said that "he, the said John McGovern, had never had a venereal disease." The brother's testimony is based on an examination of John at a time when neither of the boys was a doctor or had even begun the study of medicine, and there is no evidence of any complications resulting. The only testimony in this respect concerns statements made by testator to his brother that he was impotent and statements made to the parish priest, at a time when the priest was trying to settle the difficulties between testator and Hannah, that doctors had told testator that he was impotent. But the basis for such a conclusion does not appear and cannot overcome the plain facts showing the contrary established by the great weight and clear preponderance of the evidence. In judging testimony given by physicians as to their opinions upon certain facts assumed in the questions put to them we must bear

in mind that the opinions neither establish nor tend to establish the truth of the facts upon which they are based. The matters assumed are to be proven. ˙ Such opinions are pertinent only in so far as the hypothesis upon which they are based is true and correct. Any infirmity in the hypothesis attaches to the answer predicated upon it. *Schnetzky v. Zanto* (1921), 174 Wis. 160, 182 N. W. 751; 3 Jones, Evidence (2d ed. rev. by Henderson, 1926), pp. 2425, 2426, § 1326; 2 Wigmore, Evidence (3d ed. 1940), pp. 799, 800, § 680.

The facts then upon which to test the existence of the alleged delusion of testator and to test whether or not it was an insane delusion are these: Testator, who is suffering from a sexual neurasthenia prior to his marriage, and who' apparently overcomes this neurasthenia a few weeks after marriage and is able to consummate the marriage relation; a man of forty-two years of age wedded to a young woman some thirteen years his junior begins to accuse his wife of infidelity although she had given him no reason to suspect her and her reputation in the small village where she had been born and reared was beyond all suspicion. The testator becomes the father of a child by this woman and denies his paternity on the ground that the baby has red hair and none of the members of his family had red hair. He continues to accuse his wife of infidelity. His wife becomes pregnant a second time but he continues in his belief that he is impotent and that he is not the father of their child. He drives from his office a man who had never gone with the wife of testator either before or after their marriage. At the time of accusing his wife and denying his paternity testator became subject to spells when his cheeks would flush and his eyes stare; his doubts of his wife grew so strong that he would nightly go through the house looking for men who he thought were consorting with her and would rush outside the house thinking that he heard persons crossing the bridge in front of the ˙house. So unendurable did this situation become that his

wife was forced to leave with their ten months' old daughter. Thereafter testator secretly divorced his wife and only once in the years following did he seek to see his former wife and daughter and on that occasion he again fell into one of his old spells denying paternity of the child and accusing his wife of infidelity. At a second meeting, this time arranged by the daughter, testator continued to remain aloof and made no effort to recognize her as his child. The only form of recognition given by testator to the fact of paternity were the formal statements made by him in signing the birth certificate and in applying for divorce when he referred to the daughter as his child, and the inquiry of the lawyer who drafted his will whether testator could disinherit a child.

If testator had reason to believe he was sterile his belief that the child was not his would have some basis to rest upon but an inability to refrain from believing in the existence of a certain fact when it is known not to exist must come from "an uncontrollable urge to follow a thought" disregarding all existing facts. If a man says that he cannot raise his right hand and then proceeds to raise it, he is fooling or, if he still believes that he cannot do it the obsession is controlling him. No other man had access to testator's wife. She became pregnant twice. The existence of these facts takes testator out of the class of impotents and places him in the class of those controlled by an obsession. It appears to us that the finding of the county court that testator did not suffer from insane delusions is contrary to the great weight and clear preponderance of the evidence.

Nor can it be held, as found by the county court, that testator was free from this obsession at the time he drew and executed the will. The experts agreed that the obsession in question was a continuing one. Proponent's expert admitted that, "if a man is under a mental obsession, or does have a mental obsession and then repeatedly for four or five years or ten years by his acts or words shows that he still is under

the control of that mental obsession, . . . that is at least substantial evidence that it is a continuing obsession." Here the record shows that from the time of his marriage to the time of his death the testator was controlled by the obsessions regarding the fidelity of his wife and the paternity of his child. That he was able to control these obsessions to the extent that they were hidden from the outside world for long periods of time and would come to the surface only when inhibitions were reduced by the testator's drinking or when their influence was vital to a decision does not militate against this view. In his every-day existence apart from his wife and child the obsessions played no part and were not of such a character as to produce any great change in personality to be reflected in his professional work or association with outsiders. There were occasions when he seemed to admit paternity, but these were under circumstances that, when given their full significance, indicate merely an understanding on his part of the accompanying presumption of a child born during wedlock. The essential feature is that whenever it seemed to be important for testator to act upon the subjects to which that obsession related it controlled him. This control is reflected by the actions of the testator at the meeting with his wife and child in Saint Paul and again when it came time to draw his will. Then the obsession came to the surface and prevented him from acting in accordance with reason and the facts.

Finally the county court was of opinion that the obsession did not affect the will as drawn. In reaching this conclusion, the court relied upon the facts of the long period of separation between the testator and his wife and daughter and the cold relations continuing to exist between them, particularly the coldness between father and child and the failure of the daughter to exhibit any signs of normal filial affection for her father. This situation again was the result of testator's conduct under the control of the obsession. Under its control he forced his wife and infant daughter from their home and

chilled any hope of reconciliation between father and child. It caused him to denounce the fact of paternity in Saint Paul at a time when his daughter was only twelve years of age. It controlled him on the only occasions that his daughter ever met him and fixed the father's strange attitude so that he could not even acknowledge his fatherhood. The question with which we are concerned is not Mary's conduct but the obsession of her father. This obsession prevented an exertion of will on his part. To sustain the conclusion of the county court we would have to reason backward from the situation that existed at the time of testator's death and overlook the estrangement that was the result of this continuing obsession which dominated the testator whenever his relations with wife and child were called into play. As in the beginning the obsession was sufficient to cause the testator to indulge in such a course of conduct as to drive the normal objects of his affection from his home, so it stood through the years as a barrier to any hopes of reuniting the ties of fatherhood, and at the close of his life this obsession compelled testator to deny, by the very silence of his will, rights to the one whose claim was the greatest to his affection, his own daughter, and whose claim he would doubtless have recognized at the time he wrote the letter in 1927 had he been able to control the obsession.

When due weight is given to the diseased condition or obsession described, there is no occasion for considering circumstances that might have been of some importance had his mind been normal. The distinction between the facts in this case and those in the *Cole Case, supra,* appear in the evidence discussed by the court in its opinion in the latter case, particularly the facts that there the testator treated alike both the son whom he denied and the son whom he recognized, there there was no evidence to show that testator's delusion continued to and after the date of the execution of his will, and there the will was in favor of a third wife who had nursed him during a long period of illness. In short, it must be said

in this case that "the delusions and obsessions of the deceased materially. influenced the provisions of [his] will or, as it may be otherwise expressed, materially affected [his] will as made." *Will of Lundquist* (1931), 205 Wis. 667, 674, 675, 238 N. W. 861.

We are of opinion therefore that the will must be denied probate and the order of the county court be reversed.

*By the Court.*—Order reversed, and cause remanded with directions to deny probate.

A motion for a rehearing was denied, with $25 costs, on June 26, 1942.