## ESTATE OF WEEK: WEEK, by Guardian *ad litem,* Appellant, vs. BERENS, Respondent.

*May 15—June 15, 1945.*

John Nelson Week, by W. E. Atwell, his guardian *ad litem,* appeals from this judgment.    The material facts will be stated in the opinion.

For the appellant there was a brief by *Atwell & Atwell* of Stevens Point, and oral argument by *W. E. Atwell.*

For the respondent there was a brief by *Fisher, Reinholdt & Peickert* of Stevens Point, and oral argument by *William E. Fisher*.

WICKHEM, J.   The issue upon this appeal is one of fact, the sole question being whether the findings of the trial court are against the great weight and clear preponderance of the evidence.   Charges of general incompetency and undue influence were either abandoned or not pressed, and the question here is whether testatrix was shown by the weight of the evidence to have been suffering at the time of the execution of the will from insane delusions which affected the disposition of her property.   The cases relied upon by contestant support the proposition that although the testatrix may have been generally competent and not subject to undue influence, the will is nevertheless not to be admitted to probate if insane delusions affecting the disposition of her property were present at the time of executing the will.   See *Will of Elbert*, 244 Wis. 175, 11 N. W. (2d) 626; *Will of Ehlke*, 244 Wis. 115, 11 N. W. (2d) 497; *Will of McGovern*, 241 Wis. 99, 3 N. W. (2d) 717; *Will of Shanks*, 172 Wis. 621, 179 N. W. 747; *Ballentine v. Proudfoot*, 62 Wis. 216, 22 N. W. 392.   The soundness of the doctrine of these cases is not contested, nor is the scope of the doctrine questioned.

Testatrix was eighty-four years old at the time of the execution of the will on October 29, 1942.   She executed the will while a patient in a hospital.   Under the terms of the will, all of Mrs. Week's property was left to her brother and none to her two grandchildren.   The two contestants were testatrix's Mrs. Week's only lineal descendants.   She had had a son who died in infancy; another son who died at the age of twenty-one years; and a third son, Harold, who predeceased his mother by some eight years.   Harold had been married to Josephine Allen Week, the mother of contestants, but had been divorced for more than ten years before testatrix's death.   From the

time of the divorce, decedent made her home intermittently with Josephine Allen Week and the children. Mrs. Week's estate, which is substantial, was not acquired through the efforts of her husband or of herself. It was inherited from brothers and a sister of the husband. The husband's will devised all of the property to testatrix if she survived him, and in the event of her failure so to do, divided it between his son, Harold, who was then living, and the two contestants, his grandson and granddaughter, respectively.

Between 1936 and 1942 testatrix executed several wills. It would unduly extend this opinion to summarize each in detail, but it is enough to say that there were five wills in which bequests of from $1,500 to $5,000 were made to testatrix's brother and the balance of the estate divided between contestants or between them and Josephine Allen Week, their mother. Another will was executed in California under date May 30, 1942, testatrix having at that time been in residence in California for some time. Under the terms of this will, the entire estate was left to Josephine Allen Week, mother of contestants, with the statement that testatrix appreciated that Josephine would do the right thing by her children. The next will was made in California on July 3, 1942, and bequeathed the entire estate to Elmer J. Youman, her brother. Thereafter, testatrix returned to Wisconsin, and on October 29, 1942, made the will offered for probate, cutting off contestants with the statement that she had made no provision for them because she had already generously provided for them in years past.

This sequence of events is put forward by contestants to show an abrupt and unexplainable abandonment by testatrix of intentions long entertained and oft expressed. Since charges of undue influence and general incompetency are neither pressed nor substantiated by the record, contestants necessarily argue that the change resulted from insane delusions entertained by testatrix. In May, 1942, testatrix wrote

Josephine Week asking her to come up and take charge of her affairs, stating that it was important and pressing. In another letter to Josephine about the same time, or a little later, while testatrix was still in California, she asked if arrange-. ments could be made to get her back to Wisconsin. She said, "I have actually been stolen blind. If I told you what had been taken and who had been the thief it is really unbelievable. Will tell, tell, tell you about it when I see you." On June 30th she wrote Josephine asking for complete statement of everything connected with her dealings with Mr. Berens, testatrix's agent in Wisconsin. The letter continues: "There was a sum of money intrusted to your care when I was taken to Dante. I would like to know what disposition you made of it." Another letter was written on July 7th to Lolita, one of contestants, in which she says that she regrets having to speak of it, but reminds Lolita that she paid her travel expenses from Stevens Point to San Francisco and also that she paid the rent of her apartment for a month and a half; that she received neither thanks nor money for this. She asked for refund of this sum, asking Lolita to sell a Persian lamb coat and diamond ring that testatrix had theretofore given her. Under date of June 30th she wrote Mr. Berens asking him to recognize no correspondence from Josephine Week or anyone else without her personal signature. On November 28, 1942, she wrote her grandson, John Week, one of contestants, stating that he had made her very happy the day after Thanksgiving in sending her a jar of marmalade and also that a Mrs. Davis had proved to be a "fly by night, could not only steal but would take the prize in any liars' club." Contestants claim that the record shows delusions that the grandchildren were stealing from her, neglecting her, and did not care for her, and that this accounts for her sudden change in attitude.

We are unable to find substantial support in the record for the charge that insane delusions affected the dispositions made by this will. Testator was old and it could quite easily be

concluded that she was irritable and unreasonable. She may have decided not to include contestants in her will because she thought that they had, as she stated, been sufficiently taken care of in the past. On the other hand, she may have had motives or reasons that might appear to be less substantial or reasonable. These facts, if true, would not bring into operation the doctrine of cases heretofore cited dealing with insane delusions. We discover no evidence of any substance to the effect that testatrix had any delusions—insane or otherwise—concerning either of the contestants. There is considerable evidence to the effect that she was on friendly terms with contestants long after the will cutting them off was executed. She may have had suspicions, reasonable or otherwise, that other people were stealing from her, but the trial court was not required to conclude that these constituted insane delusions or affected the disposition made by her will.

We consider that a further exposition of the facts would unduly extend this opinion without performing a corresponding judicial service. The trial court filed an able memorandum in which the testimony is fully analyzed, and we are of the view that his findings are not against the great weight and clear preponderance of the evidence.

*By the Court.*—Judgment affirmed.