# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

(No. 13181.—Reversed and remanded.)

LILLIAN BLACKHURST *et al.* Appellees, *vs.* MARY J. JAMES
*et al.* Appellants.

*Opinion filed April 21, 1920.*

1. WILLS—*whether disease affected the testator's mind must be
determined by its effect in particular case.* Whether the testator's
mind was affected by the disease known as senile dementia must
be determined not alone by the general nature and tendency of the
disease but by its effect in the particular case.

2. SAME—*failure to recall acquaintance does not necessarily in-
dicate failure of mental power.* The failure of the memory of an
old man to recall persons whom he has known does not necessarily
indicate a failure of mental power, where the circumstances are
such as might readily explain the failure to recall the person at
the time.

3. SAME—*when statement of testator that he owned land which
he had previously conveyed is not evidence of mental weakness.*
The statement of a testator that he still owned all his land, when,
in fact, he had conveyed three-fourths of it to his daughters, is
not evidence of mental weakness or even lack of memory, where
the conveyances were of the remainders after the reservation of
a life estate in the testator, who still had the control and use of
the land and received the income from it.

4. SAME—*extreme age and feeble health do not constitute mental incapacity to make will.* Extreme age and feeble health, though combined with a defective memory and mental sluggishness, do not render a testator incapable of making a will unless his mind has become so impaired that he is incapable of understanding the business of making his will while engaged in that act.

5. SAME—*unequal distribution of property does not justify conclusion of mental incapacity.* An unequal distribution of his property among his heirs or an unreasonable prejudice against some of them, unless it amounts to an insane delusion, will not justify the conclusion that the testator lacks mental capacity.

6. SAME—*mere persuasion is not undue influence.* Persuasion which leaves the testator free to adopt his own course is not undue influence, as the undue influence which will avoid a will must go to the extent of depriving the testator of his free agency and must operate at the time of the execution of the will.

7. SAME—*proof of undue influence must be clear.* Undue influence which will avoid a will may be established by circumstantial evidence, but the proof of undue influence must not only be consistent with the exercise of the influence but inconsistent with its absence.

8. SAME—*fact that will was executed in beneficiary's home does not prove undue influence.* The fact that the testator was living at the home of one of the principal beneficiaries under his will at the time it was executed does not prove undue influence, nor does the fact that the beneficiaries were present.

9. SAME—*when presumption of undue influence arising from a fiduciary relation does not apply.* The rule that the active participation by one sustaining a fiduciary relation in preparing a will by which he profits substantially tends to show the exercise of undue influence does not apply where there is no evidence as to where, when, by whom or under what circumstances the will was prepared or that such beneficiary had anything to do with its execution.

10. SAME—*beneficiary who occupies a fiduciary relation is not bound to prove how the will was prepared.* To place the burden of proving the absence of undue influence in the making of a will upon a beneficiary sustaining a fiduciary relation to the testator he must be shown to have been directly connected with the making of the will, and until such proof is introduced by the contestants the beneficiary is under no obligation to introduce any evidence to show who prepared the will.

11. SAME—*when transcript of proceedings for appointment of conservator for testator is admissible in will contest.* In a will contest case, where the contestants charge undue influence and mental

incapacity of the testator, a transcript of proceedings for the appointment of a conservator for the testator is admissible on the issue of undue influence, where the testator in one clause of his will gives as his reason for excluding the contestants from sharing in his estate that they instituted the proceedings for a conservator.

12. SAME—*when deeds executed by testator are admissible in a will contest.* Deeds executed by a testator to his children as a part of the transaction when his will was made are admissible, over the proponents' objection, on contest of the will, where they have a tendency to show the inequality of the whole distribution of the testator's property and for the purpose of qualifying the testator's subsequent statement to witnesses that he still owned all his land.

THOMPSON, J., dissenting.

APPEAL from the Circuit Court of Hancock county; the Hon. ROBERT J. GRIER, Judge, presiding.

O'HARRAS, WOOD & WALKER, for appellants.

SCOFIELD, HARTZELL & CALIFF, for appellees.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

William Blackhurst executed his will on August 3, 1918, and died on September 24, following. His wife had died two years before. His heirs were his three daughters, Mary J. James, Alice H. Huston and Anna E. Mulloy; his four grandchildren, the children of his deceased son Charles; and his grand-daughter, the daughter of his deceased son William. The will was admitted to probate soon after his death, and his daughter Mary J. James, and his son-in-law C. R. Huston, the husband of Alice H. Huston, were appointed executrix and executor and qualified as such. In February, 1919, the four grandchildren, children of Charles Blackhurst, filed a bill in the circuit court of Hancock county to contest the will, charging that the testator was of unsound mind at the time the will was executed and that its execution was procured by the undue influence of Mary J. James, Alice H. Huston and the latter's husband, Charles R. Hus-

ton. The question whether the instrument was the will of William Blackhurst was submitted to a jury, and a verdict was rendered that it was not his will. The court entered a decree setting aside the will, and Mary J. James, Alice H. Huston and the executor have appealed, and seek a reversal of the decree on the ground that the verdict is contrary to the evidence, that the court erred in refusing to take the question of undue influence from the jury, in receiving and rejecting evidence and in instructing the jury.

The testator was ninety-two years old the winter preceding the execution of the will. He was an Englishman, who came to this country many years ago and settled in McDonough county, where he engaged in farming. He accumulated property and acquired about 1000 acres of land. About 1894 he moved to LaHarpe, in Hancock county, where he lived until March, 1918, when he went to the home of his daughter Mrs. Huston, in Blandinsville, in McDonough county, which is about six miles from LaHarpe. After the death of his wife he continued to live in his home at LaHarpe, some of his children or grandchildren staying there with him. There is no question of his mental capacity prior to 1916. Until that time he had charge and control of his own business and there is no evidence that he exhibited any lack of mental power. He had a rupture, which in 1916 and for the rest of his life gave him very serious trouble. For a week from October 4, 1916, to October 11 he was in a very serious condition physically and was under the constant care of a physician, who visited him three or four times a day. His condition yielded to treatment and the physician ceased to visit him on October 11 and was not called any more until on January 23, 1917, when there was a return of the trouble, and the physician, Dr. Becum, was again called and treated him from that time until February 20. His calls were not so frequent as on the previous occasion and the patient got better more rapidly than he did at that time. Dr. Be-

cum was again called on April 7 and made several visits between that time and May 31. In June, also, the testator was very sick a part of the month but he was much better in July. He was worse during August and September, and in October was at his worst. The cause of his trouble was the rupture and the effect upon the bowels which resulted from it. Much of the time in August, September and October he was not rational, but during the latter part of October he got better physically and mentally, and the doctor did not visit him again until in December, when he made two visits. His mental condition at that time was the same as it had been before the serious attack in September and October. No visit was made in January and only one in February, on February 20, when his physical condition was much better than it was in August and September. It was on March 18 that he left LaHarpe and went to Blandinsville. Dr. Provine saw him two or three days later and afterward visited him occasionally during the summer to take care of the rupture. His physical condition was fair and he had no serious illness until in August, when he was taken with his last sickness. The will was executed at Charles R. Huston's house on August 3, 1918. The witnesses were Charles L. Welsh and Marion B. Welsh, who were brothers and had known the testator all their lives. Charles was a dry-goods merchant in Blandinsville and Marion was a farmer living near. Huston told Charles that Blackhurst wanted him and his brother to witness his will. It was Saturday, and Charles said that in the afternoon his brother would be in to help in the store and they could attend to it then. Charles went out to bring in his brother to help in the store and on the way back they stopped at Huston's house, about one o'clock in the afternoon. Mrs. Huston admitted them to the house and they found Blackhurst sitting at a table in the second room. He produced the will and asked Marion to read it over to him. This was done. Blackhurst said, "That is the way I want it,"

signed it by making his mark, and the witnesses then signed it at his request. Mrs. James and Mrs. Huston were in the room part of the time but took no part in what was done. At the same time Blackhurst signed two deeds, which were also witnessed by the Welshes, one of which conveyed 100 acres of land to Mary J. James and Alice H. Huston and the other 160 acres to Luella C. Blackhurst, both conveyances reserving a life estate. The same land was devised by the will to the respective grantees in the deeds. After banking hours that afternoon, O. M. Roberts, the assistant cashier of the First National Bank of Blandinsville, of which Huston was cashier, went to Huston's house at his request and as a notary public took the acknowledgment of the execution of the deeds. He was there ten or fifteen minutes. He had known Blackhurst many years, and asked him if he remembered the time Roberts went out to kill a beef for him, when Roberts was a butcher. Blackhurst said he did and told him what kind of an animal it was. He spoke of how well Mrs. Huston and Mrs. James treated him and said they made the home very pleasant for him. Roberts asked him if he signed the deeds of his own free will and accord, and Blackhurst said he did. Roberts said, "This is quite a little piece of business," and Blackhurst answered, "Yes; it is my business and I can do what I please with it." These witnesses had a previous acquaintance with Blackhurst of long standing and were of the opinion that he was then mentally competent. On October 19, 1916, a few days after the death of his wife, Blackhurst made deeds of 245 acres of land to Mary J. James, 245 acres to Alice H. Huston and 300 acres to Anna E. Mulloy, reserving a life estate in each deed. These deeds, together with those executed at the same time as the will, disposed of all his real estate, subject to the estate reserved for his life, except his home place in LaHarpe, worth about $5000, and left only this place and personal property of the value of about $7000 to pass under his will.

After Blackhurst went to Blandinsville to live with the Hustons, his four grandchildren, who are the contestants, and his daughter Mrs. Mulloy, filed a petition in the county court for the appointment of a conservator for him and the summons was served on him on July 27. His will devised to his grand-daughter Luella C. Blackhurst, and his daughters Mrs. Huston and Mrs. James, respectively, the land described in the two deeds executed at the same time as the will. It directed the payment of his debts, the erection of a monument to himself and his wife and devised the residue of his estate to Mrs. Huston and Mrs. James. The fifth paragraph of the will was as follows:

"*Fifth*—My daughter Diane E. Mulloy (usually called Ana E. Mulloy) and my four grandchildren, namely, Fred Blackhurst, Lillian Blackhurst, Ruby Voorhees and Lena Grigsby, the children of my deceast son, Charles E. Blackhurts, have for a period of time last past tormented and annoyed me with reference to the management of my property, and my said daughter and four grandchildren last mentioned have recently filed a petition with the county court of McDonough county, Illinois, asking that a conservator be appointed for me and to look after my property and charging that I am incapabil of managing and caring for my own estate, which charges are altogether false and untrue, for which reason I do not give said Diana E. Mulloy of said Fred Blackhurst, Lillian Blackhurst, Ruby Voorhees and Lena Grigsby, any part or parcel of my estate other than that which I have advanced to them prior to the making of this will, and feeling as I do that they have treated me unjustly, unfairly and improperly, it is my desire that neather my said daughter nor said grandchildren shall ever receive any part of my said estate."

The evidence of unsoundness of mind of the testator begins in 1916. The substance of Dr. Becum's testimony has already been stated. He said in addition that there were times prior to July, August and September, 1917, when

Blackhurst was not very clear on things that were taking place right at the time, but the doctor did not notice that he was suffering from delusions until he had his bad spell in August. In August and September he was suffering from some delusion, and the doctor thought it was due to his senile condition and would call the mental trouble senile dementia,—a form of insanity; a condition of mind which prevented him from knowing the common things which were occurring around him and a disease which is usually progressive. The patient improved from that condition, and the doctor was unable to state whether he discovered any evidence of senile dementia after August or September. Blackhurst's physical condition was much better when Dr. Becum last saw him, on February 20, 1918, although still poor, and the doctor was of the opinion that his mind was not sound at that time.

Dr. Martin, a neighbor of Blackhurst in LaHarpe and a friend of long acquaintance, who saw him frequently, noticed a change beginning in 1916 and gradually growing more pronounced. Blackhurst would sometimes be as he had always been, then again he would be confused. He once asked the doctor who he was, and before an answer could be given said, "Why, this is the doctor, ain't it?" He wandered off of the subject being discussed and then said, "Doctor, you must excuse me; I am getting different from what I used to be; you might think it is because I couldn't see you, but it wasn't that; it was just because I didn't know you,—wasn't certain of you." At times he was forgetful and inattentive to the subject of conversation and it would be necessary to repeat to him, but as a general rule he kept very close to the subject. The doctor was of the opinion that Blackhurst was suffering from senile confusion, due to a progressive decay of the mental faculties incident to old age, and that when the doctor last saw him he was not of sound mind because he was forgetful of different things. That was in June or July, 1917.

Dr. Barker, an osteopathic physician, who had known Blackhurst for ten years and met him two or three times a week in his home in LaHarpe, for three years before the death of Mrs. Blackhurst, whom he was treating, saw some of the signs of mental decay or senile dementia. He testified that Blackhurst had a tendency to talk of things that happened many years before with exact detail, but it was hard for him to remember current events. The doctor was at Blackhurst's home within two or three months before Mrs. Blackhurst died,—three times when Blackhurst became lost and wanted to be taken home. The doctor was of the opinion that Blackhurst was suffering from senile dementia and that the condition was progressive.

Allen St. Clair, who was assessor in 1917, called upon Blackhurst on April 6. Blackhurst either was or had been sick, and the assessor did not think he realized what the assessor's business was, though it was explained to him. The assessor thought that Blackhurst was feeble-minded at that time. He got the information to fill the schedule from Mrs. Mulloy.

Several witnesses testified to meeting Blackhurst in 1916, after his wife's death, and in 1917, and to his inability to recognize them though he had previously known them well or remember them after having his attention called to them. There was testimony, also, that on several occasions he was lost in his own house; that he was sometimes under the delusion that he was not at home and wanted to be taken home. Some of the witnesses expressed the opinion, based on their observation of these occurrences, that he was not at the time of sound mind.

Mrs. Lulu M. Burr testified that after Mrs. Blackhurst's death she was called to witness Blackhurst's signature to a paper which Mrs. James, who was present with Mrs. Huston, said was for disposing of some money which had accumulated in the bank. Mrs. James presented the paper, pen and ink and told him they wanted him to write his

name. He wrote his name and Mrs. Burr signed as a witness. The paper for four inches above his signature was blank. He was in a dazed condition and Mrs. Burr thought him of unsound mind. Mrs. Angeline Hamilton, who also signed as a witness, testified to the same facts and opinion.

None of the witnesses who have been mentioned saw Blackhurst after February, 1918, or testified in regard to his condition subsequent to that date. Frank Wisshead, who was a grandson of Blackhurst's wife's brother, saw him at Huston's home on May 17, 1918, and tried to talk to him, but he did not know Wisshead. Wisshead, who was about thirty-six years old, had been at Blackhurst's house a few times in childhood but had not seen him for five or six years. Wisshead's father had four sons, but Blackhurst said he did not know he had a son named Frank and did not recognize him. Wisshead did not think he was of sound mind and memory at that time.

Mrs. Effie Reed's husband had been a tenant of a farm of Blackhurst for fourteen years and she had known him while they lived on the farm though she had not conversed with him a great deal. On May 30, 1918, she saw him at Huston's. When she went in Mrs. Huston asked Blackhurst if he knew her, and he said he did not, and when Mrs. Huston told him she was Mrs. Reed he said he ought to know her. She did not think he was of sound mind.

Carl Martin, a son of Dr. Martin, knew Blackhurst after he came to LaHarpe to live and was a near neighbor. He walked and talked with him and never saw anything wrong with him mentally while he lived at LaHarpe though at times Blackhurst did not seem to know who he was right away, but Martin supposed it was on account of old age, and as soon as he told Blackhurst who he was Blackhurst knew him. On the Wednesday of the race meet at LaHarpe in 1918, which was July 31, Martin saw Blackhurst in front of his house at LaHarpe in an automobile with Mr. and Mrs. Huston and Mrs. James and stopped to shake hands

with him.   He did not know Martin, and when Mrs. Huston told him who it was he then did not know him, but when she repeated the information Blackhurst finally knew him.   Martin's opinion was that Blackhurst was not then of sound mind and memory; that his mind had failed a great deal.

Mrs. Jessie Webb Craig lived diagonally across the street from the Hustons and went over there once a week or perhaps in two or three weeks.   She saw Blackhurst and he would acknowledge her greeting but she never conversed with him or tried to.   On September 5 or 6 she was at Huston's house.   Blackhurst was sitting in a chair with a bath robe over his clothes, and every once in a while he would start up and say, "If we don't hurry we will miss the train."   One of the children came home from school, and he asked her to bring his fur coat as he was going to take a sleigh ride.   Witness thought him of unsound mind.

Thomas J. Davis was a barber, who went to the house to shave Blackhurst once a week after he moved to the Huston home.   At one time he told Blackhurst who he was and said that he had shaved Blackhurst when he lived in LaHarpe and was in Blandinsville on a visit.   Blackhurst said he had never been shaved by a barber.   Davis shaved Blackhurst once when he was satisfied that Blackhurst did not know he was shaving him.   At another time, shortly before his death, Blackhurst wanted Davis to take him home.   Davis thought Blackhurst had a very childish mind, and that part of the time he was of sound mind and part of the time not of sound mind.

In August, 1918, Abram Cox, who had lived in Blandinsville for six years but had formerly lived in LaHarpe, was at his home when Huston's car, driven by his son, stopped.   Blackhurst was on the front seat and Mrs. Huston and Mrs. James on the back seat.   Cox, who was an intimate friend of Mrs. James, went out to see her and spoke to Blackhurst, asking how he was feeling.   He took Black-

hurst by the hand and began talking with Mrs. James and Mrs. Huston for a few minutes. Blackhurst held Cox's hand until they started away and said nothing. Newton Wilson, who had stopped to speak to Cox as the car drove up, also spoke to Blackhurst but received no reply. He was of the opinion that Blackhurst was not of sound mind.

Besides Dr. Provine, the two Welshes, who witnessed the will, and Roberts, who took the acknowledgment of the deeds, the appellants examined a number of witnesses as to the testator's mental condition from 1916 until his death. A. L. Hodges, a teamster, who had known Blackhurst well for forty years, moved some goods from his house in LaHarpe to Huston's the day Blackhurst was taken there. Blackhurst was helped from the house to the automobile by two people, one on each side. After he reached Blandinsville Hodges went in and talked with Blackhurst about old times and the difference in farm work and improvements in transportation because of the automobile, and thought him of as sound mind as ever.

W. B. Kaiser, cashier of the bank in LaHarpe where Blackhurst did his banking business, had known and transacted such business with him for twenty-two years. He saw him one day in the winter or fall of 1917 in his home when he did not recognize Kaiser. On the day Blackhurst moved to Huston's the automobile stopped in front of the bank and Kaiser went out and talked with Blackhurst about his health, and saw him again in the summer of 1918 in an automobile in LaHarpe. On both occasions the witness thought him mentally sound.

William Calvert, a teamster, who had known Blackhurst for twenty-five years, went to Huston's in April, 1918, to plow the garden and went in to see Blackhurst, whom he found in bed. Blackhurst immediately recognized him, addressed him as Billy and asked about his family and they engaged in a general conversation. Calvert could see no change in him, mentally.

Edward M. Phillips had known Blackhurst well for thirty or thirty-five years. On June 29, 1918, Mrs. Huston, who was going to Macomb, asked him to sit with her father until Huston returned from the bank. He was with Blackhurst three hours and conversed with him during that time. They talked about Blackhurst's land, how much he owned and the horses he used to own. Blackhurst thought they did not raise such horses now as they raised then. Phillips asked him how much land he owned, and he said between 900 and 1000 acres. Phillips asked him if he still handled his own business, and Blackhurst said he did not but Charlie Huston looked after his business now; that he was getting too old to get around and look after it. When Phillips told him he thought he had a pretty good memory, Blackhurst said it wasn't very good; that he could remember back pretty well but things that happened to-day he would forget to-morrow. The old gentleman told him that his birthday was on Christmas. Phillips asked him about his age, and he answered that he would be ninety-three on Christmas day. He talked as intelligently as ever and seemed to be of sound mind and memory. His conversation seemed as sane as any man's could be, but he said his memory was poor.

E. W. Hayder had known Blackhurst for fifteen years, during the first twelve and a half years of which Hayder was employed by Huston in the lumber business and Blackhurst bought his lumber from him, telling him to let certain of his tenants have certain lumber and paying his bills from time to time. During the last two and a half years of Blackhurst's life Hayder saw him only once. Hayder had moved from Blandinsville and was a traveling salesman. He visited in Blandinsville and called upon Blackhurst on August 10, 1918, being with him about an hour and a half and having a general conversation with him. During the conversation Blackhurst told him that Huston was very good to him, sleeping in the same room and an-

ticipating and satisfying his wants.   Blackhurst also asked
Hayder if he wouldn't rather be back at his old employ-
ment.   He thought Blackhurst mentally sound and saw no
difference in him from what he had previously known.

Strawther Givens lived on a farm adjoining Blackhurst's
from 1858 to 1870 and knew him well.   Givens attended
a picnic in Blandinsville on July 18, 1918, and ate dinner
at Huston's residence.   Blackhurst was lying down when
Givens arrived and dinner was waiting.   Givens greeted
him and went to dinner.   After dinner was over Black-
hurst was sitting up, dressed, and the two had a conversa-
tion of about an hour's duration.   They talked about old
time events known to both,—about the death of Mrs. Black-
hurst and of Mrs. Givens.   Blackhurst said his home was
broken up by the death of his wife but he had a good home
with his daughter and was well treated.   He told of the
number of farms he owned and said that he still owned all
the farms he owned when Givens left the neighborhood.
Givens thought Blackhurst of sound mind.

John B. Place lived at LaHarpe for twenty-four or
twenty-five years, after which he was away for eleven years,
returning to visit occasionally.   He knew Blackhurst well
while living in LaHarpe.   During 1918 he saw Blackhurst
twice,—once in May and once in the first ten days of Au-
gust.   He called at the Huston house and stayed each time
from fifteen to thirty minutes.   At one of the calls Black-
hurst was sitting up and at the other lying down.   On both
occasions Place talked with and was recognized by Black-
hurst and thought him as sane as at any time he met him.

Mrs. Hazel Hyatt was at the Huston home from time to
time, engaged in sewing.   She was introduced to Blackhurst
as Hazel Fife and he asked her who her father was.   She
told him and he said he remembered him well.   When she
went to the house she talked with him on different topics
and he talked well.   He never talked of his property or of
his children or grandchildren, except to say that he had a

good home. She saw nothing in his actions or conversation to indicate that he was of unsound mind and thought him sane.

Mrs. Ed Hays brought butter to the Huston home and met Blackhurst in March, 1918. He asked if Ed Hays was her husband, and said that he knew Ed when he passed by the team he drove. She had a conversation with Blackhurst after the summons was served upon him on the petition for the appointment of a conservator. He told her he didn't think he would ever go back to LaHarpe to live; that he had a good home with the Hustons. He spoke of his grandchildren and Anna Mulloy, and said, "If they would let me alone I would give them more, but if they don't they will never get any more than they have gotten; Mrs. Hays, I am a man of my word; if the Lord will give me strength I will fix it." He told of a conversation he had had with Mr. and Mrs. Mulloy in which he said he told Mulloy to go away,—he didn't want to hear any more,—and Mulloy said, "Well, there will be a bigger lawsuit over your estate than there ever was over your father-in-law's; I never expect to lay eyes on your face, dead or alive," and that Mrs. Mulloy said the same thing as good-by. He also spoke of the Charlie Blackhurst children not coming to see him, and said Fred had not visited him for six months before he left LaHarpe, and he would tell Lena to tell the rest to come, but she had said that she didn't think they would so long as he was at Huston's. Mrs. Hays also testified that after the will was executed Blackhurst told her he had fixed it as he said he would. She saw nothing to indicate that he was not of sound mind.

The appellants introduced the testimony of fifteen or more other witnesses testifying to meeting the testator at various times from March, when he came to Blandinsville, to the time of the execution of the will, and to conversations which they had with him and giving their opinions that at these times he was of sound mind. The great pre-

ponderance of the testimony is that before the death of his wife Blackhurst's memory had become defective, and that while he was able to recall events which were long past, the people whom he had met and occurrences which had happened more recently were recalled by him with difficulty. During the serious attacks of sickness which occurred from time to time after the death of his wife he was at times irrational and his condition was such that he had not mental capacity sufficient for the transaction of business, and in the protracted illness a year after his wife's death, in the fall of 1917, he was entirely incompetent to attend to any business, but he recovered from these attacks and his physical and mental condition improved, with occasional lapses, from October, 1917, until February, 1918, when Dr. Becum made his last visit to him. The testimony of Drs. Becum and Martin indicates their opinion that he was suffering from senile dementia and that that disease is progressive in its nature, but the facts testified to indicate that his mental condition was improving for several months before he left LaHarpe; that in his case the disease was not at that time progressing and that his mental faculties were not deteriorating. The question whether the testator's mind was affected by the disease must be determined not alone by the nature and tendency of the disease but by its effect in the particular case. (*Teter* v. *Spooner,* 279 Ill. 39.) From the time he left LaHarpe his condition apparently improved. The only testimony as to his unsoundness of mind during the spring and summer of 1918 is the testimony of witnesses who base their opinion that he was of unsound mind upon his inability to recognize and remember them. The failure of the memory of an old man to recall in some cases persons whom he has known does not necessarily indicate a failure of mental power. An absolute and total loss of memory might do so, but in each one of the cases testified to, the circumstances were such as might readily explain the failure to recall the person at the time.

There were many more cases in which the testator did remember the persons whom he met, recalled past events, carried on intelligent conversations, discussed questions of business or current events in an intelligent manner and exhibited a capacity to comprehend the circumstances with which he was surrounded. The statement to some of the witnesses that he still owned all the land he had previously owned is not evidence of mental weakness or even lack of memory. Though he had conveyed the remainder in three-fourths of it to his three daughters and retained only a life estate for himself, he was the owner of the present interest in the land, had the control and use of it and was in receipt of the income from it. After his wife's death he intrusted his business to Charles R. Huston, his son-in-law, as his agent, and when his tenants afterward came to him with reference to their leases he declined to transact business with them and referred them to Huston. Of itself this is no indication of an unsound mind. Extreme old age and feeble health, though combined with a defective memory and mental sluggishness, do not constitute mental incapacity. Such infirmities frequently accompany old age, but they do not render a man incapable of making a will unless his mind has become so impaired that he is incapable of understanding the business of making his will while engaged in that act. An unequal distribution of his property among his heirs or an unreasonable prejudice against some of them, unless it amounts to an insane delusion, will not justify the conclusion that the testator lacked mental capacity. *Carnahan* v. *Hamilton,* 265 Ill. 508.

Much of the testimony of the contestants' witnesses as to the condition of the testator's mind after his wife's death until he left LaHarpe refers to the times when he was depressed by the severe physical suffering and sickness which were the effect of his rupture. Some of it is mere failure of memory, and the conclusions of unsoundness of mind which the witnesses draw have no sufficient basis of fact.

This is true of all the five witnesses who testified to such conclusions from meeting the testator after he went to Blandinsville. The other testimony of this character is remote from the time of the execution of the will, and has little, if any, tendency to contradict the direct evidence of the witnesses to the execution of the will, the officer who took the acknowledgment of the deeds, and the numerous other witnesses who met and talked with the testator within a short time both before and after the execution of the will. The verdict of the jury was manifestly against the weight of the evidence as to the testator's mental capacity when he executed the will.

On the other question, of undue influence, the verdict is also unsupported by the evidence. The will itself states the motives which influenced the testator in excluding the contestants from participation in his estate. Mary Hankins, who lived across the street from the Hustons, testified that in the summer of 1918, while sitting at her window, she saw Mrs. Huston and Blackhurst sitting on their porch when Lena Grigsby, one of the contestants, called. Blackhurst turned his back on her and she went away. Mrs. Huston went to her father and said, "That is the one that said you are crazy." Afterward Mrs. Hankins said that on the day the papers were served on Blackhurst she heard Mrs. Huston say, "Oh, pappy! I would never let them have a dollar." Persuasion which leaves the testator free to adopt his own course is not undue influence, and the undue influence which will avoid a will must go to the extent of depriving the testator of his free agency and must operate at the time of the execution of the will.

The appellees contend that the will was the result of a conspiracy by Mr. and Mrs. Huston and Mrs. James to procure its execution; that Huston sustained a fiduciary relation to the testator and is benefited by the will and that he prepared the will, and that from these facts a presumption of undue influence arises against him and his wife and

Mrs. James, who are associated with him, which has not been rebutted by the evidence. There is no doubt that Huston sustained a fiduciary relation to Blackhurst and that there existed a warm affection between Mrs. Huston and Mrs. James and their father, but there is no evidence that any one of them ever requested him to make a will or suggested anything about the disposition of his property, except the exclamation of Mrs. Huston which Mary Hankins said she heard while listening inside her window, across the street from the Huston porch. There is no evidence that Huston, Mrs. Huston or Mrs. James had anything to do with the preparation of the will and none that they had anything to do with its execution, except that Huston told Charles Welsh that Blackhurst wanted him and his brother to witness his will. It must be conceded that the three had an opportunity to try to influence the making of a will, but mere opportunity is not enough to show the exercise of a wrongful influence. While undue influence may be established by circumstantial evidence, such evidence must show that the influence was operative at the time of the transaction sought to be impeached and was such as to destroy the freedom of the testator's mind. (*Waterman* v. *Hall,* 291 Ill. 304.) The fact that the testator was living at the home of one of the principal beneficiaries under his will at the time it was executed does not tend to prove undue influence. (*Farmer* v. *Davis,* 289 Ill. 392.) Neither does the further fact that the beneficiaries were present at the time the will was executed. (*Brock* v. *Stines,* 258 Ill. 346.) The active participation of one in a fiduciary relation in preparing a will by which he profits substantially and procuring it to be executed are circumstances tending to show the exercise of undue influence. (*Yess* v. *Yess,* 255 Ill. 414.) The appellees seek to apply this principle in the present case. If it were otherwise applicable, one thing lacking which makes it inapplicable is participation in the preparation and execution of the will. There is no evi-

dence as to where, when, by whom or under what circumstances the will was prepared. The testator's remarks to Mrs. Hays, which have been mentioned, indicate his intention to make a will which would exclude the appellees from any share in his estate. Huston was not present at its execution and is not shown to have known anything about its preparation.

The appellees argue that Blackhurst had not been away from home and there is no evidence that any attorney or scrivener had called to see him; that Huston, his wife or Mrs. James, or all of them, knew who prepared the will and deeds; that if none of them prepared these papers they could have called the person who did prepare them, as a witness, but no such witness was called, therefore the appellees draw the necessary inference, as they say, that these papers were prepared by Huston or under his direction. Upon the presumption of his preparation of the will, added to the presumption of undue influence from the fiduciary relation, rests the claim of the exercise of undue influence. The burden of proof in regard to undue influence, however, rests upon the appellees. The existence of a fiduciary relation between a testator and a beneficiary under his will does not raise a presumption of undue influence, as in cases of voluntary conveyance by deed. (*Michael* v. *Marshall,* 201 Ill. 70; *Yess* v. *Yess, supra; Waterman* v. *Hall, supra.*) To place the burden of proof of the absence of undue influence in the making of the will upon a beneficiary sustaining a fiduciary relation to the testator he must be shown to have been directly connected with the making of the will. (*In re will of Barry,* 219 Ill. 391.) The presumption of undue influence arises not from the fiduciary relation but from the fact that the fiduciary prepared the will. (*Wunderlich* v. *Buerger,* 287 Ill. 440.) The proof of undue influence must not only be consistent with the exercise of the influence but must be inconsistent with its absence.

(*Waterman* v. *Hall, supra.*)    Until proof was introduced that Huston was instrumental in procuring the will to be made the appellants were under no obligation to introduce any evidence.    The burden was not on them to show who prepared the will and the appellees offered no evidence on this question.

The appellants offered in evidence a transcript of the proceedings for the appointment of a conservator, and an objection of the appellees was sustained.    It should have been overruled.    The transcript was admissible on the issue of undue influence and to sustain the reasons given by the testator in the fifth paragraph of his will for excluding the appellees from sharing in his estate.    *Hartrick* v. *Hartrick,* 272 Ill. 613.

The deeds of October 19, 1916, and those executed on the same day as the will, were admitted in evidence over the appellants' objection.    The former were admissible to qualify the testator's statement to one or more of the witnesses that he owned all the lands he had formerly owned, and the latter were a part of the transaction when the will was executed.    They all had a tendency to show the inequality of the testator's distribution of his property and were properly admitted.

Objections are made to instructions given, modified and refused, but we do not regard them as of material importance.    The instructions fairly state all the law necessary to a determination of the issues and contain no error which we regard as prejudicial.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*

Mr. JUSTICE THOMPSON, dissenting.