[No. 35969. En Banc. October 8, 1962.]

*In the Matter of the Estate of* MARIE A. MEAGHER, *Deceased.*

THE NATIONAL BANK OF COMMERCE OF SEATTLE *et al.,*
*Appellants,* v. HUGH MIRACLE, *Respondent.**

*Martin, Shorts & Bever* and *George W. Martin*, for appellants.

*McCutcheon, Soderland & Wells*, for respondent.

*Reported in 375 P. (2d) 148.

ROSELLINI, J.—This is a will contest, initiated by the respondent, in which the trial court held invalid a will executed by Marie A. Meagher on October 1, 1957, and reinstated a will which she signed on July 18, 1940. This action of the trial court was grounded upon its finding that Mrs. Meagher was suffering from insane delusions at the time she executed the will, which rendered her incompetent to make testamentary disposition of her property.

The appellants contend that there was no evidence that the will was the product of delusions, and also that the evidence, as a matter of law, demonstrates a logical and rational disposition of the testatrix' property.

It is appropriate at this point to set forth the applicable principles of law which guide a decision in a case of this kind. The first of these is that the right to dispose of one's property by will is not only a valuable right, but is one assured by law and protected by statute. *In re Gordon's Estate,* 52 Wn. (2d) 470, 326 P. (2d) 340. Where a will, rational on its face, is shown to have been executed in legal form, the law presumes that the testator had testamentary capacity and that the will speaks his wishes. *In re Mitchell's Estate,* 41 Wn. (2d) 326, 249 P. (2d) 385. One who contests a will has the burden of establishing its invalidity by evidence which is clear, cogent, and convincing. *In re Gordon's Estate, supra.*

A will may be invalidated if it is shown, by evidence that is clear, cogent, and convincing, that at the time the will was executed, the testator was laboring under insane delusions that materially affected the disposition made in the will. In *In re Klein's Estate,* 28 Wn. (2d) 456, 183 P. (2d) 518, we quoted the following pertinent language from *In re Shanks' Will,* 172 Wis. 621, 179 N. W. 747:

" 'It is not a question whether testator had general testamentary capacity, for many persons laboring under insane delusions may be competent to make a will (*Will of Cole,* 49 Wis. 179, 5 N. W. 346), but whether the insane delusion under which the testator suffered materially affected the will he made. In other words, is it reasonably certain that but for the insane delusion his wife would have received a materially larger devise?' "

Other facets of the rule are found in *Jackman v. North*, 398 Ill. 90, 75 N. E. (2d) 324, 175 A. L. R. 868:

"The law is that a prejudice or dislike that a testator or testatrix might have for a relative is not ground for setting aside a will unless such prejudice and dislike cannot be explained on any other ground than that of an insane delusion. *Blackhurst v. James,* 293 Ill. 11 [127 N. E. 226]; *Carnahan v. Hamilton,* 265 Ill. 508 [107 N. E. 210, Ann. Cas. 1916C, 21]. . . .

"In *Owen v. Crumbaugh*, 228 Ill. 380 [81 N. E. 1044, 1051, 119 Am. St. Rep. 442, 10 Ann. Cas. 606] after setting forth various definitions of what constitutes an insane delusion, it was said: 'Whatever form of words is chosen to express the legal meaning of an insane delusion, it is clear, under all the authorites, that it must be such an aberration as indicates an unsound or deranged condition of the mental faculties as distinguished from a mere belief in the existence or nonexistence of certain supposed facts or phenomena based upon some sort of evidence. A belief which results from a process of reasoning from evidence, however imperfect the process may be or illogical the conclusion, is not an insane delusion. An insane delusion is not established when the court is able to understand how a person situated as the testator was, might have believed all that the evidence shows that he did believe and still have been in full possession of his senses. Thus, where the testator has actual grounds for the suspicion of the existence of something in which he believes, though in fact not well founded and disbelieved by others, the misapprehension of the fact is not a matter of delusion which will invalidate his will.' "

 A conviction which a testator arrives at by process of reasoning, however illogical, from existing facts, is not such an "insane delusion" as would affect his capacity to make a will. *Knight v. Edwards*, 153 Tex. 170, 264 S. W. (2d) 692.

 As the rule is stated in an annotation in 175 A. L. R. 964, even if there is evidence of an insane delusion of such a nature as to affect the will, if there is also evidence of some other and rational motive for the disposition made, the burden is upon the contestant to rebut or overcome the legal presumption of validity, by showing that the de-

lusion, exclusive of rational motive, was the controlling cause.

█ In each of the cases cited by the respondent to sustain the trial court's conclusion that this will was invalid because it was induced by insane delusions, the contestant was disinherited. While we have found no recent cases on this point, it is said in Ann. Cas. 1916C, 20[1] (and now in 57 Am. Jur. 91, § 81) that a will is not invalidated by a delusion of the testator with respect to a relative who is provided for with reasonable liberality by the will.

With these rules in mind, we have examined the evidence which shows that Marie O'Donnell Meagher was born March 27, 1876, in Ontario, Canada, one of a family of five boys and three girls. The family moved to Butte, Montana, where she married William Meagher. In 1909, the Meaghers moved to Seattle. One of Mrs. Meagher's sisters, Kathryn Miracle, came to Seattle at about the same time. Margaret Vucovich, another sister, moved to California. Her brother Jack remained in Butte, and Michael moved to Denver, Colorado. The record is silent as to the other brothers.

The respondent was the only child of Kathryn Miracle. Jack O'Donnell, who died in the 1920's, had three daughters, who now are Madelon Scherer, Elizabeth Holcomb (both of Denver), and Margaret O'Donnell, of Butte. Neither Michael O'Donnell nor Mrs. Meagher had any children. Mrs. Meagher had a cousin in Tacoma, Mrs. Lee Taft, whose grandchildren were also remembered in her will, as were two of Mrs. Meagher's cousins, William and Aileen Collins, who were living in Ontario at the time of her death.

Over the years, Mrs. Meagher kept in touch, through correspondence and visits, with these relatives. The one to whom she was closest was the respondent, who was taken into the Meaghers' home when he was a young child and was reared by them.

Margaret Vucovich was committed to the state hospital at Napa, California, about 1922, and Kathryn Miracle was

---

[1]Citing *Rice v. Rice*, 50 Mich. 448, 15 N. W. 545; *In re Iredale's Will*, 53 App. Div. 45, 65 N. Y. S. 533; *Cole's Will*, 49 Wis. 179, 5 N. W. 346.

committed to Western State Hospital, in June, 1935. For a short period thereafter, the respondent was guardian for his mother. Mrs. Meagher was later substituted in his place.

In July, 1940, Mrs. Meagher, who was then a widow, executed a will in the respondent's law office, under the terms of which all of her property, after the payment of debts, funeral and burial expenses, and expenses of administration, was left to the respondent.

The following year she was called to Colorado by her brother, who had become ill. While she was there, he executed a will setting up a trust to take care of his three sisters, two of whom were then in mental hospitals. He also made specific bequests of $2,000 each to Madelon Scherer, Elizabeth Holcomb, Margaret O'Donnell, and the respondent. Mrs. Meagher was made a cotrustee of his will. She performed her duties as trustee after Michael O'Donnell's death in 1942 until she died in 1959.

On November 27, 1955, when Mrs. Meagher was 79 years of age, she sustained a hip fracture and was hospitalized in traction 80 days. She remained in the hospital an additional 30 days; and after being discharged, went to a nursing home. She remained there several months and then returned to her home, where she lived alone. All arrangements for hospital, doctor, medical care, and nursing home, were made by the respondent.

Shortly after Mrs. Meagher was admitted to the hospital, the respondent, without consulting her, caused to be filed a petition for the appointment of his law partner, Kenneth S. Treadwell, as guardian of her estate, and the appointment was secured. The respondent justified this action on the ground that when he visited Mrs. Meagher in the hospital, she was hostile, confused, and uncommunicative; and he concluded that she was not mentally capable of handling her affairs. In order to pay her doctor and hospital bills, the guardian cashed government bonds having a face value of $4,500.

After Mrs. Meagher had been admitted to the nursing home, she was examined by Dr. John B. Riley, a psychiatrist, who reported in a letter to the orthopedist who at-

tended her in the hospital, Dr. Bernard A. Gray, that he had found her distinctly incompetent, psychotic and committable, but recommended that she remain in the nursing home if she could afford it.

Within a few months thereafter, in the summer of 1956, Mrs. Meagher was released from the nursing home and returned to her former residence. On August 22, 1956, she visited the office of Dr. Gray and was examined by him at the request of Mr. Treadwell. After that visit, the doctor wrote to Mr. Treadwell advising him:

" . . . She is quite alert mentally and there are no apparent signs of delusions or other mental abnormality . . . In answer to your specific question I would say that there is no further need for a guardianship in this case."

The guardianship was not terminated. The completion of the closing report was delayed during the months of September and October. The respondent and his law partners testified that the delay was caused by a casual handling induced by the fact that it involved a partner's family affairs rather than office clients. On October 24, 1956, Mrs. Meagher, through a neighbor and mutual friend, contacted an attorney, Emmett G. Lenihan, and requested that he consult with her about the guardianship. He went to the courthouse and checked the record, and on October 26, 1956, went to see her at her home. In an effort to determine in his own mind whether or not the guardianship should be terminated, Mr. Lenihan questioned her about her assets, business affairs, and family background. They had a long conversation about her injury, the large hospital and doctor bills, unpaid bills, and the guardianship. She expressed provocation with the respondent because, as she said, he would not discharge the guardianship, and because he had caused bonds to be sold when there was other money available to pay expenses. (The evidence showed that she had a voluntary revokable trust account more than sufficient to pay the bills. The respondent was the beneficiary of this account, which had not been listed in the guardianship inventory, although the passbook was in the respondent's safe.) Respondent testified that he had no independent recollection of the existence

of the account during the pendency of the guardianship, and had found the passbook in an envelope in the office in the firm's safe, in an envelope marked: "Hold for Mrs. W. E. Meagher," in the spring of 1960.

Mr. Lenihan contacted the respondent and advised him of his aunt's wish to have the guardianship terminated. The respondent was reluctant to consent to this. However, upon Mr. Lenihan's insistence, the guardianship was terminated on December 13, 1956.

Mrs. Meagher at that time expressed to Mr. Lenihan a desire to write a will. He advised her not to do so at that time because he felt that she might be too much influenced by her resentment toward the respondent. This advice she accepted; but after conferring with a trust officer at the appellant bank, she had her bonds converted to treasury notes. This officer testified at the trial of this action that he had found no reason to believe that she was not fully competent to handle her own affairs.

In the spring of 1957, Mrs. Meagher sold her home and exhibited full mental competence in this transaction. In her correspondence with her niece, Madelon Scherer, during this time, she also exhibited an excellent awareness and memory of persons and events. Her neighbors of long standing all testified to their belief in her competency. They were not aware that she was the victim of any insane delusions, although they knew that she was provoked with her nephew because of the guardianship.

Before her hospitalization in 1955, Mrs. Meagher and the respondent had maintained a very close relationship and showed to each other the affection and regard that are generally characteristic of mother and son, but after that they became estranged and never re-established the relationship. However, Mrs. Meagher continued to be friendly with the respondent's wife, who visited her from time to time, drove her to visit her sister (the respondent's mother) at Western State, and did errands for her.

In September, 1957, Madelon Scherer received a telephone call in Denver from Mrs. Naughton, one of Mrs. Meagher's neighbors, suggesting that Mrs. Scherer come to

Seattle, because she felt that Mrs. Meagher needed a member of her family near her. Mrs. Scherer came to Seattle on this advice and stayed about a month. Before leaving, she found a room for Mrs. Meagher in a neighboring home, where she stayed until Mrs. Naughton found a place for her in St. Vincent's Home. She remained there until her death.

During Mrs. Scherer's visit, Mrs. Meagher again expressed the desire to write a will and said that she was impressed with the fairness of the disposition which her brother Michael had made of his property and wanted to dispose of her own in a like manner. Mr. Lenihan, who was again contacted, went to see her. They discussed in great detail the provisions that she wished to make, and Mrs. Meagher explained her reasons.

She said that her primary concern was for her sister, the respondent's mother, and after a discussion of this matter, it was decided that a trust should be created and the trustee should be authorized to expend up to fifty per cent of her estate for the care and maintenance of Mrs. Miracle. Mrs. Meagher stated that she desired to treat her nieces and nephew equally, as her brother had. She also wished to remember her cousins and the grandchildren of her second cousin in Tacoma, and determined upon a specific bequest for each of these. She desired to make a gift to St. Joseph's Catholic Church; and the remainder of her estate she wished to bequeath in equal shares to her nephew and nieces.

Mr. Lenihan also discussed with her the advisability of setting up a voluntary lifetime trust, with her bank as trustee, to look after her property and collect her income. She agreed that this would be a good idea and the details were discussed at length.

The next day Mr. Lenihan telephoned the cotrustee of the O'Donnell trust, in Denver, and verified the information Mrs. Meagher had given him with regard thereto. He also, with Mrs. Meagher's consent, discussed the new will with the respondent, and the voluntary trust with the senior trust officer of Mrs. Meagher's bank.

During his conversation with the respondent, Mr. Lenihan was told that the proposed will would be contested.

Consequently, Mr. Lenihan telephoned Mrs. Meagher's family doctor, who suggested that Dr. Riley should examine her. Mr. Lenihan called Dr. Riley and told him that he was preparing a will to be executed by Mrs. Meagher on the following day and that the will might be contested, and requested an examination into her mental capacity, particularly as to her knowledge of her property and relatives.

Later on the same day, September 30, 1957, Dr. Riley informed Mr. Lenihan by telephone that he had examined her, that she knew who her relatives were, and what her property consisted of, that she would not be influenced by any person, and that she had the mental capacity to make a will. In his testimony at the trial, Dr. Riley could not recall that he had reported to Mr. Lenihan, but stated, "I imagine it is true; it sounds reasonable."

A will and trust agreement embodying the wishes of Mrs. Meagher were executed the following day in the presence of disinterested witnesses, who testified at the trial that they were convinced of her testamentary capacity.

After his examination of Mrs. Meagher, Dr. Riley telephoned the respondent and advised him of his findings. The respondent suggested that he examine Mrs. Meagher again and look for insane delusions concerning himself. Dr. Riley did so, a week after the will was executed, and reported to the respondent that although she was in full possession of her faculties regarding the amount and location of her assets and was not subject to undue influence, he found that she had delusions of persecution toward the respondent. By inference, he said, she accused the respondent of forging the 1940 will, of entering her safe deposit box and removing about $4,500 worth of bonds, of writing his name on two bonds which were left there, of illegally having a guardian appointed for her without having first consulted her, and stated that she doubted she ever had a fractured hip. She refused, however, to make any direct accusations. In the course of the report, the doctor said:

" . . . She attempts to minimize any friction between you and she states that everything is fine, but eventually has to admit that there has been disharmony and states why,

but refuses to openly accuse you of defrauding her, stealing from her or deluding her . . ."

Dr. Riley did not report these findings to Mr. Lenihan. He testified at the trial that his examinations of Mrs. Meagher had convinced him that she was suffering from insane delusions toward the respondent, and his testimony was supported by that of Dr. Jack J. Klein, a psychiatrist, who had not examined Mrs. Meagher, but gave his opinion in answer to a hypothetical question posed by the respondent.

The trial court was of the opinion that it was obliged to accept the testimony of these experts, and concluded that the will was induced by these delusions.

In disposing of this appeal we need not consider whether the court was justified in accepting the testimony of the psychiatrist and disregarding entirely all the evidence of the lay witnesses because, even if there was evidence of an insane delusion of such a nature as to affect the will, there was substantial evidence of other and rational motives for the disposition made. The respondent has failed to overcome the presumption of validity and to show that the delusion, exclusive of the rational motive, was the controlling cause in the disposition of the property.

There is substantial evidence that, prior to the onset of Mrs. Meagher's alleged delusions, she had always enjoyed a relationship with the respondent that was extremely close, much closer than the relationships which she had with her other relatives. This was because she had taken him into her home as a child and had reared him as though he were her own son. In 1940 she made a will leaving all of her property to him. This was evidence tending to establish the fact that she regarded him with the affection she would have for a son and would accordingly desire to leave to him the bulk of her property.

However, there are other factors which enter into the picture. The foremost of these is that Mrs. Meagher had also been very close to her sister, who was a helpless person confined in a mental hospital; that she had been her guardian and the trustee of an estate administered for her

benefit; that she visited her regularly and attended to her needs as much as she was able. Her will of 1940 made no provision for that sister. This fact would indicate that at the time she executed the will, she did not have in mind all of the natural objects of her bounty.

Another factor is that Mrs. Meagher was made a trustee under her brother's will, that she had had many years in which to observe the fairness of it and to develop an appreciation of the brother's generosity in providing for his sisters, who were old, and two of whom were helpless. She had an opportunity to observe how her brother had dealt as generously with his nephew, whom he scarely knew, as he did with his nieces who were near him. In view of these circumstances, it can hardly be said that she was irrational in deciding that her own will should be drawn with equal regard for the comparative needs of those who were the natural objects of her bounty. It is also reasonable to suppose that she thought of her nephew's financial independence, his success as a lawyer, and the fact that she had already done much more for him than she had for the nieces.

A reading of the record in this case convinces this court that Mrs. Meagher was a very generous and undemanding woman, one who was always more eager to give than to receive, one who appreciated kindness and fairness and who possessed these qualities herself. The will she executed in 1957 appears to this court to be a perfect expression of those qualities which characterized the woman. No bitterness is expressed in it toward her nephew. It is evident that, whatever delusions she may have had, she put them aside when she designed her will.

The respondent was given a liberal bequest, equal to that given others standing in the same blood relationship to the testatrix.

The evidence is overwhelming that the will was the product of logical and rational motives and not of any insane delusion which the testatrix may have suffered.

The judgment is reversed and the petition dismissed.

ALL CONCUR.